[No. S121532. May 23, 2005.]

JACK JEVNE et al., Petitioners, v.
SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JB OXFORD HOLDINGS, INC., et al., Real Parties in Interest.

**936**

938

## COUNSEL

Law Offices of Zilinskas & Woosley, Victor G. Zilinskas and Eric A. Woosley for Petitioners.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Andrea Lynn Hoch, Chief Assistant Attorney General, David S. Chaney, Assistant Attorney General, Lawrence K. Keethe and Amy J. Winn, Deputy Attorneys General, for Attorney General Bill Lockyer as Amicus Curiae on behalf of Petitioners.

Kate Gordon, Arthur Bryant, Michael J. Quirk; McGuinn, Hillsman & Palefsky and Cliff A. Palefsky for California Employment Lawyers Association and Trial Lawyers for Public Justice as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Miller Milove & Kob, Jeffrey S. Kob and W. Richard Sintek for Real Parties in Interest.

Conkle & Olesten and Eric S. Engel as Amici Curiae on behalf of Real Parties Interest.

George R. Kramer; Munger, Tolles & Olson, Marc T. G. Dworsky, Paul J. Watford and Anne M. Voigts for Securities Industry Association as Amicus Curiae on behalf of Real Parties in Interest.

Milbank, Tweed, Hadley & McCloy, Douglas W. Henkin and M. Benjamin Valerio for New York Stock Exchange, Inc., as Amicus Curiae.

Gibson, Dunn, & Crutcher and Mark A. Perry for NASD Dispute Resolution, Inc., as Amicus Curiae.

Giovanni P. Prezioso, Jacob H. Stillman, Eric Summergrad, John W. Avery and Meyer Eisenberg for Securities and Exchange Commission as Amicus Curiae.

Horvitz & Levy, David S. Ettinger and Mitchell C. Tilner for Judicial Council of California as Amicus Curiae.

## OPINION

**KENNARD, Acting C. J.**—In 2001, the California Legislature enacted Code of Civil Procedure section 1281.85, subdivision (a) (hereafter section 1281.85(a)), which directed the California Judicial Council to establish ethics standards for persons serving as neutral arbitrators under contractual arbitration agreements. (Stats. 2001, ch. 362, § 4.) As explained in a legislative report, the Legislature's purpose was "to provide basic measures of consumer protection with respect to private arbitration, such as minimum ethical standards and remedies for the arbitrator's failure to comply with existing disclosure requirements." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 475 (2001–2002 Reg. Sess.) Aug. 20, 2001, p. 1.)

In response to the Legislature's directive, the Judicial Council adopted the Ethics Standards for Neutral Arbitrators in Contractual Arbitration (Cal. Rules of Court, appen., div. VI; hereafter the California Standards), most of which became effective on July 1, 2002. The stated purposes of the California Standards are "to guide the conduct of arbitrators, to inform and protect participants in arbitration, and to promote public confidence in the arbitration process." (*Id.*, std. 1(a).)

The California Standards are not the only ethics standards to which neutral arbitrators may be subject. The National Association of Securities Dealers, Inc., (NASD) is a self-regulatory organization (SRO) that licenses and regulates broker-dealers in the national securities industry. Through its wholly owned subsidiary, NASD Dispute Resolution, Inc. (NASDDR), it has adopted a Code of Arbitration Procedure (the NASD Code) to govern the arbitration of disputes between its members and their customers. Like the California Standards, the NASD Code contains disclosure requirements and disqualification procedures for arbitrators. Under the authority of the federal Securities

Exchange Act of 1934 (15 U.S.C. § 78a et seq.; hereafter SEA), the United States Securities and Exchange Commission (SEC) has approved the NASD Code. (See *Shearson/American Express, Inc. v. McMahon* (1987) 482 U.S. 220, 234 [96 L.Ed.2d 185, 107 S.Ct. 2332] (*McMahon*) ["[T]he SEC has specifically approved the arbitration procedures of . . . the NASD."].)

We granted review in this case to address five issues: (1) Did section 1281.85(a) authorize the Judicial Council to adopt ethics standards for arbitrators appointed by arbitration providers like the NASDDR? (2) Does the SEA preempt section 1281.85(a) and the California Standards for NASDDR-administered arbitration? (3) Are the parties to an arbitration agreement relieved of their duty to arbitrate when their arbitration provider has refused to proceed with arbitration for more than one year? (4) May the parties to an arbitration waive application of the California Standards? (5) Does the Federal Arbitration Act of 1925 (9 U.S.C. § 1 et seq.; hereafter FAA) preempt section 1281.85(a) and the California Standards in arbitrations based on contractual arbitration agreements or disputes affecting interstate commerce?

We conclude that section 1281.85(a) authorized the Judicial Council to adopt ethics standards for arbitrators appointed by arbitration providers like the NASDDR, but also that the SEA preempts section 1281.85(a)and the California Standards for NASDDR-administered arbitration. Under the circumstances of this case, we further conclude that the delay in arbitrator selection and appointment, resulting from uncertainty regarding the applicability of the California Standards, does not relieve plaintiffs of their duty to arbitrate. In light of these conclusions, we find it unnecessary to address the remaining issues concerning waiver and preemption under the FAA.

## I. FACTS AND PROCEDURAL HISTORY

In early 1996, Jack Jevne opened an account with JB Oxford & Company (Oxford) in the name of Avalon Investments, S.A. (Avalon), a business entity that Jevne wholly owns, to safeguard funds obtained from the sale of certain securities. Oxford is a licensed securities broker-dealer and a member of the NASD. To open the account, Oxford required Jevne to sign an "account opening statement" in which he agreed that all disputes with Oxford would be resolved by arbitration in accordance with the NASD Code. The account opening statement declared that California law would govern "[t]he agreement and its enforcement."

Jevne has alleged that when he opened the account, he personally instructed Oxford that he was the only person authorized to withdraw funds and securities from the account. He has further alleged that Oxford violated this

instruction by allowing $1,026,535 to be taken from the account between April 1997 and September 1999 through a series of withdrawals that he did not authorize.

In August 2000, Jevne and Avalon (plaintiffs) sued Oxford and JB Oxford Holdings, Inc. (defendants) in superior court alleging negligence, breach of fiduciary duty, and conversion. Defendants moved to compel arbitration under the terms of the account opening statement. Plaintiffs did not oppose the motion, which the trial court granted, and in May 2001 the parties signed a uniform submission agreement agreeing to arbitrate according to the NASD Code. After one "non-public arbitrator" and two "public arbitrators" were appointed according to the NASD Code, the arbitration proceedings began.[1]

---

[1] For a claim exceeding $50,000, the NASD Code requires "an arbitration panel composed of one non-public arbitrator and two public arbitrators, unless the parties agree to a different panel composition." (NASD Code, rule 10308(b)(1)(B).)

The NASD Code provides these definitions of nonpublic and public arbitrators:

"(4) 'non-public arbitrator'

"The term 'non-public arbitrator' means a person who is otherwise qualified to serve as an arbitrator and:

"(A) is, or within the past 5 years, was:

"(i) associated with a broker or a dealer (including a government securities broker or dealer or a municipal securities dealer);

"(ii) registered under the Commodity Exchange Act;

"(iii) a member of a commodities exchange or a registered futures association; or

"(iv) associated with a person or firm registered under the Commodity Exchange Act;

"(B) is retired from, or spent a substantial part of a career, engaging in any of the business activities listed in subparagraph (4)(A);

. "(C) is an attorney, accountant, or other professional who has devoted 20 percent or more of his or her professional work, in the last two years, to clients who are engaged in any of the business activities listed in subparagraph (4)(A); or

"(D) is an employee of a bank or other financial institution and effects transactions in securities, including government or municipal securities, and commodities futures or options or supervises or monitors the compliance with the securities and commodities laws of employees who engage in such activities.

"(5) 'public arbitrator'

"(A) The term 'public arbitrator' means a person who is otherwise qualified to serve as an arbitrator and:

"(i) is not engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D);

"(ii) was not engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D) for a total of 20 years or more;

"(iii) is not an investment advisor;

"(iv) is not an attorney, accountant, or other professional whose firm derived 10 percent or more of its annual revenue in the past 2 years from any persons or entities listed in paragraph (a)(4)(A); and

"(v) is not the spouse or an immediate family member of a person who is engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D).

"(B) For the purpose of this Rule, the term 'immediate family member' means:

After the California Standards went into effect in July 2002, the NASD adopted a rule, designated IM-10100-(f), establishing a temporary waiver program for arbitrations in California. Under this rule, to participate in NASDDR-administered arbitration, California investors were required to waive application of the California Standards (to have their arbitration proceedings held in California) or agree to conduct the arbitration outside of California. The SEC promptly approved the waiver rule as a six-month pilot program.[2] (See 67 Fed. Reg. 62085-01 (Oct. 3, 2002).) The SEC has approved several extensions of the NASD's temporary waiver rule, which is to expire on September 30, 2005. (70 Fed.Reg. 8862-01 (Feb. 23, 2005).)

On July 9, 2002, the NASD arbitration panel granted defendants' motion to dismiss plaintiffs' claim, with leave to amend. Plaintiffs filed an amended claim, and defendants again moved to dismiss. In September 2002, before the panel ruled on this motion, the nonpublic arbitrator disqualified himself for undisclosed reasons. The NASDDR suspended the proceedings and asked plaintiffs to sign a statement waiving application of the California Standards. Plaintiffs refused to sign the waiver and, in February 2003, asked the superior court to set aside the order compelling arbitration and to restore the matter to the active civil trial calendar. In April 2003, the court denied the motions. Plaintiffs then petitioned the Court of Appeal for a writ of mandate directing the trial court to set aside its order denying the motions and to enter a new order granting the motions. The petition named defendants as real parties in interest.

---

"(i) the parent, stepparent, child, or stepchild, of a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D);

"(ii) a member of the household of a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D);

"(iii) a person who receives financial support of more than 50 percent of his or her annual income from a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D); or

"(iv) a person who is claimed as a dependent for federal income tax purposes by a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D)." (NASD Code, rule 10308(a)(4), (5).)

[2] In September 2002, before its approval of rule IM-10100-(f), the SEC announced it had asked Michael Perino, an associate professor at St. John's University School of Law in Jamaica, New York, "to assess whether the current disclosure requirements in the NASD and NYSE arbitration procedures should be modified to reflect any of the new disclosure concepts in the new California rules." In November 2002, the SEC released Professor Perino's report, with this summary of its conclusions: "Perino's report concludes that there is little if any indication that undisclosed conflicts represent a significant problem in NASD or NYSE (collectively, SROs) arbitrations. As a result, his report concludes that having the SROs adopt the California arbitration rules would likely yield very few benefits for investors. At the same time, his report concludes that adopting the California arbitration rules may impose significant costs and may have significant unintended consequences that may reduce investors' perceptions of the fairness of SRO arbitrations."

After receiving an opposition from defendants (see Cal. Rules of Court, rule 56(b)), the Court of Appeal issued an alternative writ, and it received briefs from several amici curiae: the NASDDR, the New York Stock Exchange (NYSE),[3] the SEC, and the California Attorney General. In lieu of an amicus curiae brief, the California Judicial Council submitted a copy of a brief it had filed in another case, *NASD Dispute Resolution, Inc. v. Judicial Council of Cal.* (N.D.Cal. 2002) 232 F.Supp.2d 1055.

On November 19, 2003, the Court of Appeal denied plaintiffs' petition. Although the court concluded that the Judicial Council had acted within its authority in drafting the California Standards and that they are not preempted by the FAA, it also concluded that the California Standards conflict with, and are preempted by, the SEA. On December 11, 2003, plaintiffs petitioned the Court of Appeal for a rehearing to consider issues not addressed in the original decision. The Court of Appeal denied rehearing the next day.

We granted plaintiffs' petition for review. Thereafter, on April 21, 2004, we granted a joint motion to intervene by the NASDDR and the NYSE (interveners) as additional real parties in interest. We have also accepted briefs from several amici curiae: the California Employment Lawyers Association, the Trial Lawyers for Public Justice, the Securities Industry Association, the California Attorney General, and the California Judicial Council.

After we had placed this matter on calendar for oral argument, a panel of the United States Court of Appeals for the Ninth Circuit issued its decision in *Credit Suisse First Boston Corporation v. Grunwald* (9th Cir. 2005) 400 F.3d 1119. Consistent with our decision in this case, which affirms the judgment of the state Court of Appeal, the Ninth Circuit concluded that the Judicial Council had statutory authority to adopt ethics standards for arbitrators appointed by arbitration providers like the NASDDR, but also that the SEA preempts the California Standards for SRO-administered arbitration.

## II. THE CALIFORNIA STANDARDS AND SRO-APPOINTED ARBITRATORS

Do the California Standards that the Judicial Council adopted in 2002 apply to neutral arbitrators appointed for contractual arbitration by an SRO or other third party arbitration service or provider? To the extent the California Standards purport to apply to arbitrators appointed by SRO's and other third party arbitration providers, are they invalid as exceeding the scope of the statutory authorization?

---

[3] The NYSE, like the NASD, is an SRO that administers an arbitration program under rules approved by the SEC.

■ Section 1281.85(a) mandates that "a person serving as a neutral arbitrator pursuant to an arbitration agreement shall comply with" the California Standards. Code of Civil Procedure section 1280, subdivision (d) (hereafter section 1280(d)) defines a "neutral arbitrator" as one who is either "(1) selected jointly by the parties or by the arbitrators selected by the parties or (2) appointed by the court when the parties or the arbitrators selected by the parties fail to select an arbitrator who was to be selected jointly by them." As mentioned earlier, the Legislature enacted section 1281.85(a) in 2001; it adopted section 1280(d)'s definition of arbitrator, however, much earlier, in 1961 (Stats. 1961, ch. 461, § 2, p. 1540), and it has not amended this definition since.

■ The California Standards define "neutral arbitrator" somewhat differently than section 1280(d) does: " 'Arbitrator' and 'neutral arbitrator' mean any arbitrator who is subject to these standards and who is to serve impartially, whether selected or appointed: [¶] (A) Jointly by the parties or by the arbitrators selected by the parties; [¶] (B) By the court, when the parties or the arbitrators selected by the parties fail to select an arbitrator who was to be selected jointly by them; or [¶] (C) *By a dispute resolution provider organization, under an agreement of the parties.*" (Cal. Stds., std. 2(a)(1), italics added.)[4] The standards define "[d]ispute resolution provider organization" as "any nongovernmental entity that, or individual who, coordinates, administers, or provides the services of two or more dispute resolution neutrals." (*Id.,* std. 2(g).)

■ The California Constitution grants the Judicial Council authority to, among other things, "adopt rules for court administration, practice and

---

[4] The California Standards do not apply to "party arbitrators" (defined as an arbitrator selected unilaterally by a party) or to international arbitration proceedings under Code of Civil Procedure section 1297.11 et seq.; judicial arbitration proceedings under Code of Civil Procedure section 1141.10 et seq.; attorney-client fee arbitration under Business and Professions Code section 6200 et seq.; the automobile warranty dispute resolution process under California Code of Regulations, title 16, division 33.1; workers' compensation arbitration under Labor Code sections 5270 et seq. or 5308 et seq.; contractor complaint arbitration under Business and Professions Code section 7085 et seq.; or "arbitration conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements." (Cal. Stds., std. 3(b).)

When drafting the California Standards, the Judicial Council also considered whether they should apply to SRO-administered securities arbitration. In a report to members of the Judicial Council, staff gave this explanation for its decision: "An exemption was not added for securities industry disputes because these disputes did not fall within any of the categories warranting exemption. They are arbitrations conducted under arbitration agreements, not independent statutory schemes; they are binding arbitrations, not some other dispute resolution process; and, while the self-regulatory organizations that administer these arbitration programs are subject to oversight by the Securities and Exchange Commission, the specific procedures of their dispute resolution programs, including any applicable ethics requirements, do not appear to be mandated by statute or government regulation."

procedure, and perform other functions prescribed by statute." (Cal. Const., art. VI, § 6, subd. (d).) The Constitution adds: "The rules adopted shall not be inconsistent with statute." (*Ibid.*; see also *People v. Mendez* (1999) 19 Cal.4th 1084, 1094 [81 Cal.Rptr.2d 301, 969 P.2d 146].) Because statutes are construed to effectuate the enacting body's intent, the test for determining whether a rule that the Judicial Council has adopted exceeds statutory authority is whether the rule conflicts with the legislative intent underlying the authorization statute. (See *People v. Hall* (1994) 8 Cal.4th 950, 960–961 [35 Cal.Rptr.2d 432, 883 P.2d 974]; *In re Robin M.* (1978) 21 Cal.3d 337, 346 [146 Cal.Rptr. 352, 579 P.2d 1].) Thus, a rule may be broader than the literal terms of its authorizing statute, provided it reasonably furthers the statutory purpose. (*Trans-Action Commercial Investors, Ltd. v. Firmaterr, Inc.* (1997) 60 Cal.App.4th 352, 364 [70 Cal.Rptr.2d 449].)

On first reading, California Standards, standard 2(a)(1) appears to broaden section 1280(d)'s definition of neutral arbitrator to include a class not mentioned in the statute—arbitrators selected by a "dispute resolution provider organization" such as the NASDDR. Under the NASD Code, the NASDDR uses a computerized "Neutral List Selection System" to generate two lists of available arbitrators, one list for public arbitrators and another for nonpublic arbitrators. Each party may strike one or more of the arbitrators from each list for any reason and may rank the remaining candidates by order of preference. The NASD's Director of Arbitration then consolidates the parties' lists and appoints a panel according to their reported preferences, but if the number of remaining arbitrators is insufficient to fill the panel, the Director may appoint one or more arbitrators not named on the lists submitted to the parties. (NASD Code, rule 10308(b), (c).) Thus, although the parties' preferences play a role in the process, the NASDDR both limits the pool of potential arbitrators and, through its Director of Arbitration, makes the final selection. Whether this method of selection is consistent with section 1280(d)'s definition of "neutral arbitrator" depends on what that definition means when it refers to an arbitrator "selected jointly by the parties." Does it require that the parties *directly and personally* agree to the particular individual who is to serve as arbitrator, or is it sufficient that the parties have *jointly agreed to a selection method or procedure*, even though the method or procedure authorizes a third party to make the final determination? On this point, the statutory language is ambiguous.

To determine the legislative intent underlying section 1280(d)'s definition of "neutral arbitrator," we consider its legislative history. In 1956, the Legislature, by a concurrent resolution, authorized the California Law Revision Commission to study, among other things, whether the statutes relating to arbitration should be revised. (Stats. 1956, ch. 42, p. 264.) In December 1960, the commission submitted its report and recommendations, which

included adoption of a statutory definition of "neutral arbitrator." (Recommendation and Study Relating to Arbitration (Dec. 1960) 3 Cal. Law Revision Com. Rep. (1961) pp. G-1, G-12.) The Legislature enacted the definition of "neutral arbitrator" exactly as the commission had recommended. (Compare *id.*, p. G-12 with § 1280(d).)

"Reports of commissions which have proposed statutes that are subsequently adopted are entitled to substantial weight in construing the statutes. [Citations.] This is particularly true where the statute proposed by the commission is adopted by the Legislature without any change whatsoever and where the commission's comment is brief, because in such a situation there is ordinarily strong reason to believe that the legislators' votes were based in large measure upon the explanation of the commission proposing the bill." (*Van Arsdale v. Hollinger* (1968) 68 Cal.2d 245, 249–250 [66 Cal.Rptr. 20, 437 P.2d 508]; accord, *People v. Martinez* (2000) 22 Cal.4th 106, 129 [91 Cal.Rptr.2d 687, 990 P.2d 563].)

Regarding the meaning of "neutral arbitrator," the commission stated: "When a tripartite arbitration board is appointed, it is usually composed of a representative of each of the contending parties *and a third arbitrator chosen by the other two or by some other pre-determined procedure.* The third arbitrator, who is the *neutral arbitrator,* often acts as the chairman of the board. . . . [¶] It is suggested that the California statute should distinguish the arbitrators by their titles. *The arbitrators appointed by both parties, or by the two arbitrators chosen by the parties, or appointed by the court, or any other disinterested agency, should be designated the 'neutral arbitrator'* . . . . The arbitrators representing the parties should be designated 'party arbitrators' . . . " (Recommendation and Study Relating to Arbitration, *supra,* 3 Cal. Law Revision Com. Rep., p. G-42, italics added; see also *id.*, pp. G-7 to G-8.) This comment indicates that the primary purpose of the statutory definition of "neutral arbitrator" was to distinguish arbitrators chosen in a manner likely to ensure their neutrality and impartiality from an arbitrator selected by one party unilaterally to act as an advocate for that party's interests. The definition was not intended to exclude arbitrators selected by a neutral third party, like an arbitration provider or administrator, to which the parties had mutually assigned that responsibility. On the contrary, it was intended to include arbitrators chosen by any "disinterested agency" to which the parties mutually entrusted the task of appointing an impartial arbitrator.

This understanding of the meaning of "neutral arbitrator" is also consistent with the legislative intent underlying the 2001 legislation that authorized the Judicial Council to formulate and adopt the California Standards. Nothing in the enactment history of that legislation suggests a legislative intent to exempt from the California Standards all arbitrators appointed by arbitration

providers. Rather, the documented concerns underlying the legislation, relating to the fairness of private contractual arbitration, strongly suggest an intent to apply the standards to contractual arbitration generally.

For example, a report by the Assembly Committee on the Judiciary noted that "the growing use of private arbitrators—including the imposition of mandatory, pre-dispute binding arbitration contracts in consumer and employment disputes—has given rise to a largely unregulated private justice industry." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 475 (2001–2002 Reg. Sess.), *supra,* p. 4.) The report stated that the proposed legislation "seeks to provide basic measures of consumer protection with respect to private arbitration, such as minimum ethical standards and remedies for the arbitrator's failure to comply with existing disclosure requirements." (*Id.,* p. 1.) A Senate floor analysis stated that this legislation would apply to "an appointed arbitrator in non-judicial (private or contractual) arbitrations," that it would "address concerns of fairness by requiring private arbitrators to comply with ethical guidelines to be established by [the] Judicial Council," and that proponents of the legislation argued that strict ethical guidelines "should apply to private arbitrators to ensure that parties to the arbitration can have confidence in the integrity and fairness of the private arbitrator." (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 475 (2001–2002 Reg. Sess.) Sept. 6, 2001, pp. 1, 4–5.) We may properly consider these legislative documents in determining legislative intent. (See *People v. Cruz* (1996) 13 Cal.4th 764, 773, fn. 5 [55 Cal.Rptr.2d 117, 919 P.2d 731].)

Interveners the NASDDR and the NYSE point out that the staff of the Judicial Council, in a report to the members of the Judicial Council dated April 9, 2002, stated that the then-proposed definition of "neutral arbitrator" in California Standards, standard 2(a) "expands upon the definition of 'neutral arbitrator' in Code of Civil Procedure section 1280(d), *which does not include arbitrators appointed by a dispute resolution provider organization* or by any party acting alone, even if those arbitrators are to serve impartially." (Italics added.) Interveners argue that this statement somehow proves that standard 2(a) is inconsistent with section 1280(d) and that the Judicial Council exceeded its authority in adopting it. We are unpersuaded. The comments by the Judicial Council staff to members of the Judicial Council in 2002 are not probative of the legislative intent underlying either the 1961 enactment of section 1280(d) or the 2001 enactment of section 1281.85(a). Moreover, as we have explained, the test is not whether the rule adopted is broader than the literal terms of its authorizing statute, or a related statute, but whether the rule adopted reasonably furthers the purpose underlying the statutory authorization.

■ Given the relevant legislative history, we agree with the Court of Appeal in this case that the Legislature, when it enacted section 1281.85(a) in

2001, intended to authorize the Judicial Council to formulate and adopt ethical standards for neutral arbitrators in private (nonjudicial) arbitration generally, including neutral arbitrators appointed by third party dispute-resolution providers like the NASDDR.

## III. PREEMPTION

### A. *General Principles*

We recently explained the general principles governing claims of federal preemption of state law, in these words:

■ "The supremacy clause of article VI of the United States Constitution grants Congress the power to preempt state law. State law that conflicts with a federal statute is ' "without effect." ' (*Cipollone v. Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [120 L.Ed.2d 407, 112 S.Ct. 2608] (*Cipollone*), quoting *Maryland v. Louisiana* (1981) 451 U.S. 725, 746 [68 L.Ed.2d 576, 101 S.Ct. 2114].) It is equally well established that '[c]onsideration of issues arising under the Supremacy Clause "start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress." ' (*Cipollone*, at p. 516.) Thus, ' " '[t]he purpose of Congress is the ultimate touchstone' " ' of pre-emption analysis.' (*Ibid.*)

■ "The United States Supreme Court has explained that federal preemption arises in three circumstances: 'First, Congress can define explicitly the extent to which its enactments pre-empt state law. [Citation.] Pre-emption fundamentally is a question of congressional intent, [citation] and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one. [¶] Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a "scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." [Citation.] Although this Court has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes, it has emphasized: "Where . . . the field which Congress is said to have pre-empted" includes areas that have "been traditionally occupied by the States," congressional intent to supersede state laws must be " 'clear and manifest.' " [Citations.] [¶] Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is

impossible for a private party to comply with both state and federal requirements, [citation] or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' (*English v. General Electric Co.* (1990) 496 U.S. 72, 78–79 [110 L.Ed.2d 65, 110 S.Ct. 2270], fn. omitted; see *Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 372–373 [147 L.Ed.2d 352, 120 S.Ct. 2288]; *Olszewski v. Scripps Health* (2003) 30 Cal.4th 798, 814 [135 Cal.Rptr.2d 1, 69 P.3d 927].)" (*Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 923–924 [12 Cal.Rptr.3d 262, 88 P.3d 1]; see also *Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 955 [17 Cal.Rptr.3d 180, 95 P.3d 422].)

## B. *Preemption by the SEA*

The SEA contains no express preemption provision; on the contrary, it contains two savings clauses expressly preserving state law in certain limited areas (15 U.S.C. §§ 77p, 77r). Accordingly, neither express preemption nor field preemption by the SEA is at issue in this case. As the Court of Appeal in this case correctly recognized, and as the parties themselves agree, we are concerned here only with conflict preemption by the SEA. As noted earlier (*ante*, at pp. 949–950), conflict preemption applies in two situations: when it is impossible to comply with both the federal and the state law, and when the state law could prevent or impair accomplishment of the purposes and objectives of the federal law. (*English v. General Electric Co., supra,* 496 U.S. at p. 79.)

As a preliminary matter, we must decide whether, as defendants and interveners argue, the provisions of the NASD Code have the force of federal law, so that if the California Standards conflict with the NASD Code, they likewise necessarily conflict with the SEA, and are therefore preempted. Plaintiffs, and the California Attorney General as amicus curiae, argue that the NASD Code does not have the preemptive force of federal law, and, as a consequence, the California Standards may conflict with the NASD Code without necessarily being preempted by the SEA.

### 1. *The preemptive force of the NASD Code*

■ "Federal regulations have no less pre-emptive effect than federal statutes." (*Fidelity Federal Sav. & Loan Assn. v. de la Cuesta* (1982) 458 U.S. 141, 153 [73 L.Ed.2d 664, 102 S.Ct. 3014] (*Fidelity*).) To have preemptive effect, however, a federal regulation must be one that Congress authorized the promulgating agency to adopt. (*Id.* at p. 154.) Thus, "a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority[,] . . . [for] an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a

sovereign State, unless and until Congress confers power upon it." (*Louisiana Public Service Comm'n v. FCC* (1986) 476 U.S. 355, 374 [90 L.Ed.2d 369, 106 S.Ct. 1890]; accord, *New York v. F.E.R.C.* (2002) 535 U.S. 1, 18 [152 L.Ed.2d 47, 122 S.Ct. 1012].) Here, the relevant questions are whether the SEC intended to preempt the California Standards, and, if so, whether that action is within the scope of the SEC's delegated authority. (See *Fidelity, supra,* at p. 154 ["the questions upon which resolution of this case rests are whether the Board meant to pre-empt California's due-on-sale law, and, if so, whether that action is within the scope of the Board's delegated authority."].)

In 1973, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware* (1973) 414 U.S. 117 [38 L.Ed.2d 348, 94 S.Ct. 383] (*Ware*), the United States Supreme Court considered whether NYSE arbitration rules preempted a California law governing employee wage claims. Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch) had established a profit-sharing plan for its employees under terms providing that an employee who voluntarily terminated employment and competed with Merrill Lynch forfeited all benefits. (*Id.* at pp. 119–120.) David Ware, a former employee whose profit-sharing benefits had been forfeited under this provision, brought a class action against Merrill Lynch in California state court, arguing that the forfeiture provision was void under a California law (Bus. & Prof. Code, § 16600) prohibiting contracts that restrained anyone from engaging in a lawful profession, trade, or business. (*Ware, supra,* at pp. 120–121.) Merrill Lynch petitioned to compel arbitration, invoking an arbitration provision in Ware's employment agreement and a provision of the NYSE rules requiring that any controversy between a member and the member's employee be settled by arbitration in accordance with NYSE arbitration rules. (*Id.* at pp. 121–122.) The trial court denied the petition to compel arbitration, and the Court of Appeal affirmed, reasoning that profit-sharing contributions were a form of wages and that another California law (Lab. Code, § 229) permitted an employee to sue for wages "without regard to the existence of any private agreement to arbitrate." (*Ware, supra,* at pp. 123–125, fn. 7.)

The United States Supreme Court granted certiorari to decide "the extent to which authority delegated under a federal regulatory statute pre-empts state law." (*Ware, supra,* 414 U.S. at p. 125.) The court stated that its guiding principle was that state law "should be pre-empted by exchange self-regulation 'only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act.'" (*Id.* at p. 127, quoting *Silver v. New York Stock Exchange* (1963) 373 U.S. 341, 361 [10 L.Ed.2d 389, 83 S.Ct. 1246].) The SEA embodies Congress's decision to use an approach of "supervised self-regulation" of the national securities market. (*Ware, supra,* at p. 127.) Under the SEA, securities may be traded only on registered exchanges, and an exchange seeking registration must show that it "has rules that are 'just and adequate to insure fair dealing and to protect investors.'"

(*Ware, supra,* at p. 128, quoting 15 U.S.C. § 78f(d).) The *Ware* court noted that the SEA gave the SEC authority to alter or supplement an exchange's rules, but only in 12 designated areas; exchange rules outside those areas were not subject to SEC scrutiny. (*Ware, supra,* at p. 129.)

From this review, the high court concluded "that the congressional aim in supervised self-regulation is to insure fair dealing and to protect investors from harmful or unfair trading practices" and that "any rule or practice not germane to fair dealing or investor protection would not appear to fall under the shadow of the federal umbrella; it is, instead, subject to applicable state law." (*Ware, supra,* 414 U.S. at pp. 130–131.) Applying this conclusion to the facts before it, the *Ware* court noted that nothing in the SEA or in any SEC rule specified arbitration as the favored means of resolving employer-employee disputes, and that the NYSE rule requiring arbitration of those disputes was not within any of the areas subject to SEC scrutiny. The court further noted that arbitration of employer-employee disputes was not essential to protect investor confidence in the market, contrasting the NYSE's arbitration rule with other exchange rules providing for "direct effective disciplinary action against any abusive exchange practice." (*Ware, supra,* at p. 136.) Rules of that kind "designed to insure fair dealing and to protect investors, are of the kind directly related to the Act's purposes and ordinarily would not be expected to yield to provisions of state law." (*Ibid.*)

The high court in *Ware* rejected the NYSE's argument that federal preemption was necessary to allow national uniformity in the resolution of wage claims between exchange members and their employees. "Convenience in exchange management may be desirable, but it does not support a plea for uniform application when the rule to be applied is not necessary for the achievement of the national policy objectives reflected in the Act." (*Ware, supra,* 414 U.S. at p. 136.) The court added: "In effect, we are asked to sacrifice the individual's expectation of uniform treatment in the State of his residence for uniformity of application of the effect of an exchange's rules. We decline to do so because we believe that Congress intended that those elements of the old regime of complete self-regulation, that is, those elements not related to the federal objectives, be subject to state law and to established conflicts principles when their application out of State comes into controversy." (*Id.* at p. 138.) The United States Supreme Court thus concluded that the NYSE rule requiring arbitration of employer-employee wages disputes did not preempt California law.[5]

---

[5] In *Ware, supra,* 414 U.S. 117, the high court did not consider whether the FAA preempted Labor Code section 229 (barring enforcement of agreements to arbitrate wage claims). In a later case, the court held that it did. (*Perry v. Thomas* (1987) 482 U.S. 483, 491 [96 L.Ed.2d 426, 107 S.Ct. 2520].)

Making a significant change, Congress in 1975 amended section 19 of the SEA (15 U.S.C. § 78s) to grant the SEC "broad authority to oversee and to regulate the rules adopted by the SROs relating to customer disputes, including the power to mandate the adoption of any rules it deems necessary to ensure that arbitration procedures adequately protect statutory rights." (*McMahon, supra,* 482 U.S. at pp. 233–234.) As a result of the 1975 amendments of the SEA, the SEC must approve *any* NASD rule before it can be implemented. (See 15 U.S.C. § 78s(b).) To approve a rule, the SEC must determine that the rule is consistent with the requirements and goals of the SEA "to protect investors and the public interest." (15 U.S.C. § 78o-3(b)(6); see *McMahon, supra,* at p. 233.)

Although Congress's 1975 amendment of the SEA substantially altered the statutory scheme that the high court had earlier construed in *Ware, supra,* 414 U.S. 117, the precise impact of the amendment on the continuing validity of *Ware's* reasoning is unclear. *Ware* implied that because Congress had given the SEC authority to review SRO rules in certain defined areas, it was reasonable to infer that all rules within the designated areas were germane to the primary purposes of the SEA—fair dealing and investor protection—and that all rules outside those areas were not germane to those purposes. Interveners the NASDDR and the NYSE here appear to argue that because the SEC now reviews all SRO rules, courts must infer that all SRO rules are germane to the SEA's purposes and thus have the preemptive force of federal law.

Absent guidance from the United States Supreme Court, we are unwilling to go that far. Rather, we conclude that because the SEC now reviews all SRO rules, any of those rules *may be* germane to the SEA's goals of fair dealing and investor protection. Whether a particular rule is germane to the congressional purposes is a matter to be determined by careful examination of the rule's contents and consideration of any public pronouncements by the SEC concerning the rule's purpose and effect. As the federal agency entrusted with enforcement of the SEA, the SEC's approval of an NASD rule is an expression of federal policy that *may* have preemptive effect. (See *Dowhal v. SmithKline Beecham Consumer Healthcare, supra,* 32 Cal.4th at p. 928.) SEC approval *will* have preemptive effect if the SEC intended that the rule prevail over conflicting state law and if the SEC's decision was not arbitrary or in excess of its statutory authority. (See *Fidelity, supra,* 458 U.S. at pp. 153–154.)

The Court of Appeal here concluded that three of the California Standards—standards 7 and 8, concerning disclosure, and standard 10, concerning disqualification—conflict with the NASD Code, and thus also with the SEA. We begin with standards 7 and 8 and then examine standard 10.

## 2. *Standards 7 and 8—disclosure*

California Standards, standard 7 sets forth in considerable detail "the matters that must be disclosed by a person nominated or appointed as an arbitrator." (Cal. Stds., std. 7, subd. (a).) California Standards, standard 8 lists additional matters that an arbitrator must disclose in a consumer arbitration[6] administered by a provider organization. Among other things, the arbitrator must disclose relationships between the provider organization and any of the parties or lawyers in the arbitration.

By comparison, the NASD Code contains a relatively concise description of matters that must be disclosed: "Each arbitrator shall be required to disclose to the Director of Arbitration any circumstances which might preclude such arbitrator from rendering an objective and impartial determination. Each arbitrator shall disclose: [¶] (1) Any direct or indirect financial or personal interest in the outcome of the arbitration; [¶] (2) Any existing or past financial, business, professional, family, social, or other relationships or circumstances that are likely to affect impartiality or might reasonably create an appearance of partiality or bias. Persons requested to serve as arbitrators must disclose any such relationships or circumstances that they have with any party or its counsel, or with any individual whom [*sic*] they have been told will be a witness. They must also disclose any such relationship or circumstances involving members of their families or their current employers, partners, or business associates." (NASD Code, rule 10312(a).) The NASD Code further provides that arbitrators "must make a reasonable effort to inform themselves of any interests, relationships or circumstances" that should be disclosed, and that after appointment they have "a continuing duty . . . to disclose, at any stage of the arbitration, any such interests, relationships, or circumstances that arise, or are recalled or discovered." (*Id.*, rule 10312(b), (c).) Finally, the Director of Arbitration must advise the parties of any information disclosed by an arbitrator, unless the arbitrator voluntarily withdraws or the director removes the arbitrator. (*Id.*, rule 10312(e).)

---

[6] The California Standards give this definition of "consumer arbitration":

" 'Consumer arbitration' means an arbitration conducted under a predispute arbitration provision contained in a contract that meets the criteria listed in paragraphs (1) through (3) below. 'Consumer arbitration' excludes arbitration proceedings conducted under or arising out of public or private sector labor-relations laws, regulations, charter provisions, ordinances, statutes, or agreements.

"(1) The contract is with a consumer party, as defined in these standards;

"(2) The contract was drafted by or on behalf of the nonconsumer party; and

"(3) The consumer party was required to accept the arbitration provision in the contract." (Cal. Stds., std. 2(d).)

### 3. *Standard 10—disqualification*

California Standards, standard 10(a) provides that an arbitrator "is disqualified" in these situations:

"(1) The arbitrator fails to comply with his or her obligation to make disclosures and a party serves a notice of disqualification in the manner and within the time specified in Code of Civil Procedure section 1281.91;

"(2) The arbitrator complies with his or her obligation to make disclosures within 10 calendar days of service of notice of the proposed nomination or appointment and, based on that disclosure, a party serves a notice of disqualification in the manner and within the time specified in Code of Civil Procedure section 1281.91;

"(3) The arbitrator makes a required disclosure more than 10 calendar days after service of notice of the proposed nomination or appointment and, based on that disclosure, a party serves a notice of disqualification in the manner and within the time specified in Code of Civil Procedure section 1281.91;

"(4) A party becomes aware that an arbitrator has made a material omission or material misrepresentation in his or her disclosure and, within 15 days after becoming aware of the omission or misrepresentation and within the time specified in Code of Civil Procedure section 1281.91(c), the party serves a notice of disqualification that clearly describes the material omission or material misrepresentation and how and when the party became aware of this omission or misrepresentation; or

"(5) If any ground specified in Code of Civil Procedure section 170.1 exists and the party makes a demand that the arbitrator disqualify himself or herself in the manner and within the time specified in Code of Civil Procedure section 1281.91(d)."

The standard further provides that "[n]otwithstanding any contrary request, consent, or waiver by the parties, an arbitrator must disqualify himself or herself if he or she concludes at any time during the arbitration that he or she is not able to conduct the arbitration impartially." (Cal. Stds., std. 10(c).)

The NASD Code's arbitrator disqualification provisions differ significantly. The NASD Code provides: "After the appointment of an arbitrator and prior to the commencement of the earlier of (A) the first pre-hearing conference or (B) the first hearing, if the Director or a party objects to the continued service of the arbitrator, the Director shall determine if the arbitrator should be disqualified. If the Director sends a notice to the parties that the arbitrator

shall be disqualified, the arbitrator will be disqualified unless the parties unanimously agree otherwise in writing and notify the Director not later than 15 days after the Director sent the notice. [¶] . . . [¶] The Director will grant a party's request to disqualify an arbitrator if it is reasonable to infer, based on information known at the time of the request, that the arbitrator is biased, lacks impartiality, or has an interest in the outcome of the arbitration. The interest or bias must be direct, definite, and capable of reasonable demonstration, rather than remote or speculative." (NASD Code, rule 10308(d); see also, *id.*, rule 10312(d)(3).)

### 4. *Analysis*

As noted earlier (*ante*, at pp. 949–950), conflict preemption applies in two situations: when it is impossible to comply with both the federal and the state law, and when the state law could prevent or impair accomplishment of the purposes and objectives of the federal law. (*English v. General Electric Co., supra,* 496 U.S. at pp. 78–79.) We consider first the California Standards' disclosure requirements, then their disqualification requirements.

It is not impossible to comply with both the disclosure requirements of the California Standards and the NASD Code. Assuming that the matters required to be disclosed differ somewhat under each, the arbitrator need only disclose all matters required by both codes. For matters required to be disclosed by the California Standards, the arbitrator would make the disclosure directly to the parties, as the California Standards require. For matters required to be disclosed by the NASD Code, the arbitrator would make the disclosure to the Director of Arbitration, as the NASD Code requires.

The remaining question is whether the detailed disclosure requirements of the California Standards in any significant way impede or impair accomplishment of the goals of the NASD Code, and thereby the goals of the SEA. The SEC has expressed its opinion that the California Standards' disclosure requirements will adversely affect NASD arbitrations in three ways: by increasing administrative costs associated with the more detailed disclosure requirements,[7] by reducing the number of available arbitrators (because many will be unwilling to comply with standard 7's requirements), and by reducing the nationwide uniformity and consistency of NASD arbitrations by imposing special disclosure requirements applicable in only one state.

---

[7] In its report to the Judicial Council, the council's staff conceded that the California Standards' disclosure requirements would impose significant new administrative burdens on arbitrators and arbitration provider organizations: "Implementation of these standards, particularly the disclosure requirements, will create new administrative burdens and is likely to impose new costs on both individual arbitrators and on dispute resolution provider organizations."

The SEC first expressed these views in July 2002 in a letter addressed to the leadership of the California Legislature. In that letter, the SEC's Director stated: "[T]he burdens associated with complying with some of the disclosure requirements may have a deleterious effect on SRO arbitration programs by causing some arbitrators to resign rather than comply. Finally, adjudicating a national program to the specific requirements of any state or every state will unnecessarily burden the administration of SRO arbitration programs to the detriment of investors."

The SEC again expressed these views in October 2002 when it approved rule IM-10100 of the NASD Code, requiring waiver of the California Standards. Announcing its approval of the rule, the SEC recited the concerns expressed by the NASDDR: "The California Standards put extreme and unnecessary disclosure burdens on individuals who serve on NASD arbitration panels and already meet stringent disclosure rules. The extensive record-keeping requirements for arbitrators, coupled with potential liability for even inadvertent violations of the California Standards, led NASD to conclude that, if the NASD were required to implement the California rules, investors and other parties would be saddled with higher costs, a less efficient and streamlined process, and a much smaller arbitrator roster from which to select the panelists who will decide their cases." (67 Fed.Reg. 62085, 62086–62087.) The SEC concluded that the proposed rule change was consistent with the SEA and that accelerated approval of the rule change was "necessary to protect investors in that the rules are designed to help address the backlog of cases created by the confusion over the new California standards, are designed to provide them with a mechanism to help resolve their disputes with broker-dealers in a more expedited manner, and are designed to help ensure the certainty and finality of arbitration awards." (*Id.*, p. 62088.)

The SEC next expressed these views in January 2003 in an amicus curiae brief submitted to the federal district court in *Mayo v. Dean Witter Reynolds, Inc.* (2003) 258 F.Supp.2d 1097 (*Mayo*). (See *Auer v. Robbins* (1997) 519 U.S. 452, 462 [137 L.Ed.2d 79, 117 S.Ct. 905] [administrative agency's interpretation of federal law in a legal brief is worthy of deference when it reflects "the agency's fair and considered judgment on the matter in question"].) In that brief, the SEC stated: "The Commission is of the view that in light of the Commission's comprehensive oversight under federal law of the SROs, only the Commission can decide what disclosure and disqualification standards are appropriate for the protection of investors in SRO arbitration, and can insure that those standards are part of an effective national system. The California Standards, to the extent they apply to the SROs, are pre-empted by virtue of this scheme of federal regulation." The federal district court gave "great weight" to the SEC's views (*Mayo, supra,* at p. 1109,

fn. 15), and it concluded that the SEA preempted the California Standards for SRO-administered arbitrations (*id.* at p. 1112).

Finally, the SEC expressed these views in an amicus curiae brief submitted to the Court of Appeal in this very case. The SEC stated that the California Standards for disclosure and disqualification "are preempted by federal law" for arbitrations conducted by the NASDDR. The SEC attached a copy of the brief it had submitted in *Mayo, supra,* 258 F.Supp.2d 1097, and it reiterated its position that "only the Commission can decide what disclosure and disqualification standards are appropriate for the protection of investors or employees in SRO arbitration, for the furtherance of market efficiency and regulation of national securities associations and exchanges, and can insure that those standards are part of an effective national system."

■ In deciding whether a state law conflicts with a federal law by hindering the complete accomplishment of the federal law's objective, we give considerable weight to the views of the federal agency charged with administering the federal law. (*Geier v. American Honda Motor Co., Inc.* (2000) 529 U.S. 861, 883 [146 L.Ed.2d 914, 120 S.Ct. 1913].) Accordingly, based on the views of the SEC discussed above, we conclude that the SEA preempts the California Standards' rules on arbitrator disclosure.

The case for SEA preemption is even more compelling as to the California Standards' disqualification rules.

Standard 10 of the California Standards conflicts with rule 10308 of the NASD Code insofar as it deprives the Director of Arbitration of authority to determine whether, after an arbitrator has been appointed, that arbitrator should be disqualified on the ground of bias or interest. Under standard 10, disqualification is automatic if a party timely serves a notice of disqualification in any of the circumstances described in the standard, some of which may occur after an arbitrator has been selected and appointed. Under the NASD Code, after an arbitrator is appointed, a party may seek disqualification of the arbitrator by making an objection, but it is the Director of Arbitration who makes the disqualification determination. This may often require the exercise of judgment to determine whether information that the arbitrator disclosed after appointment, or failed to disclose before appointment, sufficiently demonstrates a disqualifying bias or interest. These different systems of arbitrator disqualification are fundamentally irreconcilable because application of standard 10 could require disqualification of an arbitrator who could not be disqualified under the NASD rules because the Director of Arbitration had determined that the arbitrator did not have a disqualifying bias or interest. (See *Mayo, supra,* 258 F.Supp.2d at p. 1107 ["Application of

the California standards thus would greatly reduce, if not eliminate in practice, the role of the Director of Arbitration in the disqualification process."].)

In October 2002, when it approved rule IM-10100 of the NASD Code, requiring waiver of the California Standards, the SEC relied on the existence of this conflict: "Under the California Standards, even inadvertent non-disclosure of immaterial relationships is a basis for removal of an arbitrator and vacatur of an award. The California Standards remove from the alternative dispute resolution administrator the power to decide contested challenges to arbitrators, instead vesting this authority unilaterally in any party to the arbitration. As currently drafted, the California Standards would allow a party unilaterally to challenge and remove one arbitrator after another, thus destroying any notion of arbitral finality and closure." (67 Fed.Reg. 62087 (Oct. 3, 2002).) In adopting a rule designed to prevent implementation of the California Standards in NASD arbitrations, the SEC made a finding that the NASD rule was "consistent with Section 15A(b)(6) of the Act, which requires that the rules be designed to promote just and equitable principles of trade, as well as to remove impediments to and perfect the mechanism of a free and open market, and, in general, to protect investors and the public interest." (67 Fed.Reg. 62088 (Oct. 3, 2002), fn. omitted.)

The SEC has expressed its view that the California Standards' disqualification provision, standard 10, conflicts with the NASD Code in a way that threatens to frustrate the congressional goals and objectives underlying the SEA. In its brief in *Mayo*, the SEC stated: "[T]he California standards for disqualification conflict with the SRO rules in that they require arbitrator disqualification in circumstances where the SRO rules do not permit it. While the SRO rules provide that an arbitrator may, prior to the hearing, be disqualified by the Director of Arbitration based upon the information disclosed under SRO rules, and the NASD allows removal based on previously unknown disqualifying information after the hearing begins, the California statute mandates that an arbitrator 'shall be disqualified,' upon notice from either party, for failure to comply with California disclosure requirements." The SEC further noted: "This conflict cannot be resolved by the SROs simply by interpreting their existing rules more broadly to accommodate the California standards. All interpretations of rules that are not reasonably and fairly implied in the rule are classified as proposed rule changes and subject to Commission review." "[U]nilateral imposition of the state's regulations would impair the balance that the Commission has struck in approving existing disclosure and disqualification rules, as well as its obligation to consider and strike a balance in any revision of those rules." "As noted, serious concerns have been raised by the Commission staff that the added opportunities under the California system for disqualification and vacature of arbitral decisions may increase the complexity, cost, and uncertainty of the

arbitration process. If so, this would serve the interests of well-financed brokerage firms, while the average investor would suffer from protracted and costly proceedings. The Commission must have an opportunity to consider these factors and make its own determination where to strike the appropriate balance."

It appears that application of the California Standards' disqualification provisions would allow a party to disqualify *any* arbitrator in an NASDDR-administered arbitration. Standard 8(b)(1)(A) requires the arbitrator to disclose any party's membership in the provider organization. Because an NASDDR-administered arbitration always includes one party—the broker/dealer—who is an NASD member, every arbitrator would have to make this disclosure. Under standard 10(a)(2), a party may serve a notice of disqualification based on any disclosure that the arbitrator has made. If the notice is timely served, in the proper form, standard 10 provides that the arbitrator "is disqualified." Thus, in an NASDDR-administered arbitration between a broker/dealer and a customer, the customer may disqualify every potential arbitrator based on the arbitrator's required disclosure that the broker/dealer is an NASD member.

The SEC's approval of rule IM-10100 of the NASD Code, and its pronouncements quoted above, reflect its determination that the NASD Code's provisions governing arbitrator selection should prevail over conflicting state law, and this determination is neither arbitrary nor in excess of its statutory authority. Therefore, we conclude that the SEA, through the SEC's approval of the NASD Code, preempts the California Standards dealing with disclosure and disqualification, including standards 7, 8, and 10.

## C. *Severability*

As plaintiff Jevne points out, the California Standards contain 17 standards in all. He argues that the SEA preempts only those standards that actually conflict with it, and that the other, nonconflicting standards may be enforced in an NASD-administered arbitration. We disagree.

■ When state law conflicts with federal law, "it is preempted only to that extent and no further." (*Peatros v. Bank of America* (2000) 22 Cal.4th 147, 158 [91 Cal.Rptr.2d 659, 990 P.2d 539] (plur. opn. of Mosk, J.); see also *id.* at pp. 172–173.) Whether the other 14 standards are enforceable in SRO arbitrations depends on whether those standards also conflict with federal law and, if not, whether they are severable from the standards that do conflict. "An invalid part can be severed if, and only if, it is 'grammatically, functionally and volitionally separable.' [Citation.] It is 'grammatically' separable if it is 'distinct' and 'separate' and, hence, 'can be removed as a

whole without affecting the wording of any' of the measure's 'other provisions.' [Citation.] It is 'functionally' separable if it is not necessary to the measure's operation and purpose. [Citation.] And it is 'volitionally' separable if it was not of critical importance to the measure's enactment. [Citation.]" (*Hotel Employees & Restaurant Employees Internat. Union v. Davis* (1999) 21 Cal.4th 585, 613 [88 Cal.Rptr.2d 56, 981 P.2d 990].)

California Standards, standards 7, 8, and 10, are *grammatically* separable from the other 14 standards in the sense that they are separate and distinct standards that may be removed without affecting the wording of the other standards. Whether they are *functionally* or *volitionally* separable, in the sense that they are unnecessary to the California Standards' operation and purpose or not critical to their enactment, is more problematic. The preempted provisions govern disclosure and disqualification, two areas that would appear to be both necessary to the California Standards' operation and critical to their enactment. When it directed the Judicial Council to draft the standards, the Legislature specified that the California Standards "shall address the disclosure of interests, relationships, or affiliations that may constitute conflicts of interest, including prior service as an arbitrator or other dispute resolution neutral entity, disqualifications, acceptance of gifts, and establishment of future professional relationships." (Code Civ. Proc., § 1281.85, subd. (a).) Thus, the preempted standards relate to the first two of the four areas required by the Legislature.

A review of the remaining standards confirms the overriding importance of the preempted standards. The first four standards impose no ethical duties on arbitrators. California Standards, standard 1 is a declaration of purpose, standard 2 contains definitions, standard 3 specifies the standards' application and effective date, and standard 4 specifies the duration of the duties the standards impose on arbitrators—"from acceptance of appointment until the conclusion of the arbitration." Standard 5 states the general duties of an arbitrator to "act in a manner that upholds the integrity and fairness of the arbitration process" and to "maintain impartiality toward all participants in the arbitration at all times." Standard 6 says that a proposed arbitrator who is unable to be impartial must decline appointment. Standard 9 states that arbitrators must make a reasonable effort to learn about matters that must be disclosed under standards 7 and 8. Standard 11 prohibits an arbitrator from accepting gifts or favors from parties or other persons whose interests are at stake in the arbitration. Standard 12 limits an arbitrator's ability to entertain or accept offers of employment from persons involved in the arbitration. Standard 13 requires arbitrators to conduct the arbitration proceedings fairly, promptly, and diligently. Standard 14 restricts ex parte communications with

the arbitrator. Standard 15 imposes certain duties of confidentiality on the arbitrator. Standard 16 governs compensation for the arbitrator, prohibiting compensation that is contingent on the outcome and requiring prior written disclosure of the terms and conditions of the arbitrator's compensation. And Standard 17 addresses the arbitrator's conduct in marketing his or her services, requiring that it be "truthful and accurate" and prohibiting solicitation of business from a participant in the arbitration while the arbitration is pending.

To the extent these other standards impose additional duties and restrictions on arbitrators, they are not severable from the disqualification standard (standard 10), because disqualification is the primary mechanism for enforcing these duties and restrictions. Accordingly, we conclude that the preempted standards—standards 7, 8, and 10 (and possibly 9 as well, because it relates to disclosure)—are not severable from the remaining standards because they are not functionally or volitionally separable, and therefore the California Standards as a whole are preempted in SRO-administered securities arbitrations.

## IV. Arbitration Delays Caused by Arbitration Provider

Plaintiffs argue that they should not be held to their arbitration agreement because they were led to believe that arbitration would lead to a quick resolution of their dispute with defendants. Under the NASD Code, rule 10304, the time limitation upon submission of a dispute is six years "from the occurrence or event giving rise to the act or dispute, claim or controversy." The alleged mishandling of the funds occurred from 1997 through 1999, so the six-year period will not expire, at least as to the later transactions, until sometime this year. In any event, the delay appears to have been reasonably necessitated by uncertainty regarding application of the California Standards. Thus, we conclude there is no reason to excuse plaintiffs from their arbitration agreement.

## V. Conclusion and Disposition

Federal law regulates the national securities market to ensure fair trading practices and the protection of legitimate investor interests. Federally registered private entities, the SRO's, are responsible in the first instance for ensuring that these congressional goals are met. A federal agency, the SEC, supervises the performance by the SRO's of their regulatory functions.

The NASD, a registered SRO subject to SEC supervision, has adopted comprehensive arbitration rules, the NASD Code, that include detailed arbitrator selection procedures. The SEC has approved these procedures, and it has determined that they should preempt the California Standards. In making this determination, the SEC has acted within its authority, and its determination is neither arbitrary nor unreasonable. Accordingly, federal securities law (the SEA, by way of the SEC's approval of specific NASD rules) preempts the California Standards.

The Court of Appeal's judgment is affirmed.

Werdegar, J., Chin, J., Brown, J., Moreno, J., Vartabedian, J.,* and Ward, J.,† concurred.

---

*Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.

† Associate Justice of the Court of Appeal, Fourth Appellate District, Division Two, assigned by the Acting Chief Justice pursuant to article VI, section 6 of the California Constitution.