# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3217

_____

Entertainment Software Association; *
Entertainment Merchants Association, *
 *
   Appellees, *
 *
  v. *
 *
Lori Swanson, in her official capacity *
as Attorney General of the State of *
Minnesota, *
 * Appeal from the United States
   Appellant. * District Court for the
_____ * District of Minnesota.
 *
American Booksellers Foundation for *
Free Expression; Association of *
American Publishers, Incorporation; *
Comic Book Legal Defense Fund; *
Freedom to Read Foundation; *
Magazine Publishers of America; *
Motion Picture Association of America, *
Incorporated; National Association *
of Theatre Owners, Inc.; Publishers *
Marketing, Publishers Marketing *
Association; Recording Industry *
Association of America; National *
Association of Recording *
Merchandisers, *
 *
   Not Parties – Amici on *
   Behalf of Appellees.

_____

Submitted:   February 12, 2007
Filed:   March 17, 2008
_____

Before WOLLMAN, SMITH, and BENTON, Circuit Judges.
_____

WOLLMAN, Circuit Judge.


The State of Minnesota appeals from the district court's[1] grant of a permanent injunction against the enforcement of section 325I.06 of the Minnesota code, which prohibits minors from purchasing or renting video games bearing a "Mature" or "Adult Only" rating.  We affirm.

**I.**


On May 31, 2006, the Governor of Minnesota signed the Minnesota Restricted Video Games Act ("the Act") into law.  The Act provides, in relevant part, that:

> [a] person under the age of 17 may not knowingly rent or purchase [a video game rated AO or M by the Entertainment Software Rating Board].  A person who violates this subdivision is subject to a civil penalty of not more than $25.

Minn. Stat. § 325I.06, subd. 2 (2006).  Additionally, the act requires that video game retailers post a sign notifying minors of the above-stated prohibition and penalty. Minn. Stat. § 325I.06, subd. 3.

---

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

The ratings pertinent to the Act are assigned to games that have been voluntarily submitted by game publishers to the Entertainment Software Rating Board ("ESRB"), a private organization established by the industry to classify games based on their age-appropriateness. Once a game is submitted to the ESRB, a panel of three trained and randomly selected reviewers considers the game and proposes a rating. Consumer focus groups evaluate the proposed rating, and game publishers may challenge the rating if they disagree with it. There are six possible ratings within the ESRB's classification system: EC (Early Childhood), E (Everyone), E+10 (Everyone 10 and Older), T (Teen), M (Mature), and AO (Adults Only). Virtually all publishers submit their games to the rating process. In the absence of state enforcement schemes, retailers voluntarily enforce the ratings by educating consumers and preventing minors under 17 from acquiring M or AO games. Despite these efforts, some children under 17 are able to rent or purchase M-rated games.

The Entertainment Software Association and Entertainment Merchants Association (Appellees), consisting of parties who create, publish, sell, and rent video games, challenged the constitutionality of the Act and sought a permanent injunction to prevent it from becoming effective. In response to appellees' complaint, the State submitted a meta-analysis performed by Craig Anderson in 2004 in support of its contention that substantial evidence allowed the inference that children's interaction with violent games causes violent behavior. Craig A. Anderson, *An update on the Effects of Playing Violent Video Games*, 27 J. Adolescence 113 (2004). The State also introduced into evidence the joint statement of six medical and public health organizations, asserting that "well over 1000 studies . . . point overwhelmingly to a causal connection between media violence and aggressive behavior in some children" and suggesting that the preliminary research suggests the impact is greater for violent video games than for television, movies, or music. Am. Acad. of Pediatrics et al., *Joint statement on the Impact of Entertainment Violence on Children*, Congressional Public Health Summit (2000).

The State's brief contains the following descriptions of several of the video games that have received M ratings:

- *Postal 2: Apocalypse Weekend* (M-rated) -- The ads for this game boast that new weapons will enable you "to hack your enemies to meaty bits!" It involves a game character who commits violent acts against unarmed civilians. Other features in the *Postal* series include: urinating on people to make them vomit in disgust, using cats as shotgun silencers, and playing fetch with dogs using human heads.

- *The Punisher* (M-rated) -- Game player is able to jam knives into victims' sternums and pull up to increase the damage, cut off heads, ram a character's open mouth onto a curb, run a character over with a forklift, rip a character's arms off with an industrial hook, and set a character on fire in an electric chair.

- *Resident Evil: 4* (M-rated) -- Game player uses a special blood-splattered chainsaw controller designed for playing the game, which includes chainsaw decapitations and impalements, and characters ripping off other character's throats and biting off their heads.

- *Manhunt* (M-rated) -- Game player's character is James Earl Cash, a convicted serial killer facing execution. The execution is ordered to be faked so that a character named "The Director" can use Cash as a star in a series of snuff films. As the Cash character kills other characters, by suffocating them with a plastic bag, slicing them up with a chainsaw, shooting them point blank with a nail gun, stabbing them in the eyeballs with a glass shard, or beheading them with a cleaver, The Director makes comments such as "You're really getting me off, Cash" and "You're really doing it for me! Why I ain't been this turned on since . . . Well, let's not go there." The game has two difficulty settings: fetish and hardcore.

- *God of War* (M-rated) -- Game features disembowelment, mouth-stabbing, eye-gouging, severed limbs, and human sacrifice.

The district court held that violent video games are protected speech even for children.  It therefore applied strict scrutiny analysis to the Act, which required the State to show that the Act was narrowly tailored to address the State's compelling interest of protecting children from psychological and moral harm resulting from their interaction with violent video games.  It found that even if the protection of minors from harm represented a compelling state interest generally, the State's evidence was largely based on flawed or inapposite studies and thus failed to establish its claim that playing violent video games causes lasting harm to the psychological well-being of minors.  The district court further concluded that even if the State had presented sufficient evidence, the Act was underinclusive because it did not address other forms of violence in the media.  Finally, it held that the Act's dependence on the ESRB to make ratings determinations that result in prohibitions on speech, with associated civil penalties, was unconstitutional because the scheme established by the Act did not permit immediate judicial supervision of ratings.  The district court granted the permanent injunction and held that the sign-posting requirement was a state-compelled false-statement that unconstitutionally required the expression of an unenforceable law. Entertainment Software Ass'n v. Hatch, 443 F. Supp. 2d 1065 (D. Minn. 2006).

**II.**

We normally review for abuse of discretion a district court's grant of a permanent injunction. Qwest Corp. v. Scott, 380 F.3d 367, 370 (8th Cir. 2004) (citing Forest Park II v. Hadley, 336 F.3d 724, 731 (8th Cir. 2003)).  Where, as here, the "determinative question is purely legal, our review is more accurately characterized as *de novo*." Id.; see also Ways v. City of Lincoln, Neb., 274 F.3d 514, 518 (8th Cir. 2001) (applying de novo review of a permanent injunction arising from a First Amendment violation).

The State contends that the district court erred by concluding that children have a protected First Amendment right of access to violent video games and consequently erred by applying strict scrutiny analysis to the Act's prohibition rather than the scrutiny more typically reserved for obscenity. The State asserts that even under its strict scrutiny analysis, the district court demanded a more rigorous evidentiary showing (that of actual causation) than that which is legally required. It also argues that the Act is neither unconstitutionally over- or under-inclusive, and that the delegation of authority to the ESRB is constitutional because the ESRB applies clear and discernable standards. Because we conclude that, under the exacting standard of proof that has been established for cases of this nature, we must affirm the district court's finding with respect to the inadequacy of the State's evidence, we do not pass on the correctness *vel non* of the district court's decision on the other issues.

We have held that violent video games are protected free speech. Interactive Digital Software Ass'n v. St. Louis County, 329 F.3d 954, 958 (8th Cir. 2003) (hereinafter Interactive Digital), a holding that the State recognizes is binding upon us, but one which it hopes might be overturned in an en banc review of this case. In light of Interactive Digital, any restriction on the purchase or rental by minors of violent video games is subject to strict scrutiny analysis. Id. at 958. We will find the Act constitutional, then, only if it is "necessary to serve a compelling state interest and . . . is narrowly tailored to achieve that end." Id. (citing R.A.V. v. St. Paul, Minn., 505 U.S. 377, 382 (1992)).

The State offers two interests that it asserts are compelling—safeguarding both the psychological well-being and the moral and ethical development of minors. As the Supreme Court has recognized, "[T]here is a compelling interest in protecting the physical and psychological well-being of minors." Sable Communications of Cal., Inc. v. F.C.C., 492 U.S. 115, 126 (1989). While we have concluded that an interest in safeguarding the psychological well-being of minors is "compelling in the abstract," the alleged harms must be shown to be "'real, not merely conjectural, and that the

regulation will in fact alleviate these harms in a direct and material way.'" Interactive Digital, 329 F.3d at 958 (quoting Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 664 (1994) (plurality opinion)). Specifically, the State must "come forward with empirical support for its belief that 'violent' video games cause psychological harm to minors." Id. at 959. "Where first amendment rights are at stake, 'the Government must present more than anecdote and supposition.'" Id. (quoting United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 822 (2000)).

In finding that the video games at issue (the specific contents of which are not described) were protected free speech, the Interactive Digital court described them as containing "stories, imagery, age-old themes of literature, and messages, even an ideology, just as books and movies do." Id. at 957 (internal quotations omitted). Whether the court would have characterized, say, "Manhunt" in similar terms, we do not know. Granted, great literature includes many themes and descriptions of violence. See, e.g., Judges 4:21 (NIV) ("But Jael, Heber's wife, picked up a tent peg and a hammer and went quietly to [Sisera] while he lay fast asleep, exhausted. She drove the peg through his temple into the ground and he died.") Indeed, a good deal of the Bible portrays scenes of violence, and one would be hard-pressed to hold up as a proper role model the regicidal Macbeth. Although some might say that it is risible to compare the violence depicted in the examples offered by the State to that described in classical literature, such violence has been deemed by our court worthy of First Amendment protection, and there the matter stands.

As did the Interactive Digital court, we accept as a given that the State has a compelling interest in the psychological well-being of its minor citizens. Likewise, we believe that the State's evidence provides substantial support for its contention that violent video games have a deleterious effect upon the psychological well-being of minors. Nevertheless, in light of the heightened standard of proof that Interactive Digital says must be applied, we conclude that the evidence falls short of establishing the statistical certainty of causation demanded thereby. In so holding, we are not as

dismissive of that evidence as have been some of the courts that have found similar evidence to be inadequate to establish the causal link between exposure to violent video games and subsequent behavior.  See., e.g., American Amusement Machine Ass'n  v. Kendrick, 244 F.3d 572, 578-79 (7th Cir. 2001); Entertainment Software Ass'n v. Blagojevich, 404 F. Supp. 2d 1051 (D.N.D. Ill. 2005); Entertainment Software Ass'n v. Granholm, 426 F. Supp. 2d 646, 653-54 (E.D. Mich. 2006); Video Software Dealers Ass'n v. Schwarzenegger, No. C-05-04188, 2007 WL 2261546, at *11 (N.D. Cal. Aug. 6, 2007).

Whatever our intuitive (dare we say commonsense) feelings regarding the effect that the extreme violence portrayed in the above-described video games may well have upon the psychological well-being of minors, Interactive Video requires us to hold that, having failed to come forth with incontrovertible proof of a causal relationship between the exposure to such violence and subsequent psychological dysfunction, the State has not satisfied its evidentiary burden.  The requirement of such a high level of proof may reflect a refined estrangement from reality, but apply it we must.

As indicated earlier, we pass no judgment on the remainder of the district court's findings and conclusions.

The judgment is affirmed.

_____