**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VIDEO SOFTWARE DEALERS
ASSOCIATION; ENTERTAINMENT
SOFTWARE ASSOCIATION,
              *Plaintiffs-Appellees,*

                  v.

ARNOLD SCHWARZENEGGER, in his
official capacity as Governor State
of California; EDMUND G. BROWN,
JR., in his official capacity as
Attorney General, State of
California,
              *Defendants-Appellants,*

                 and

GEORGE KENNEDY, in his official
capacity as Santa Clara County
District Attorney; RICHARD DOYLE,
in his official capacity as City
Attorney for the City of San Jose;
ANN MILLER RAVEL, in her official
capacity as County Counsel for
the County of Santa Clara,
              *Defendants.*

No. 07-16620

D.C. No.
CV-05-04188-RMW

OPINION

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, District Judge, Presiding

Argued and Submitted
October 29, 2008—Sacramento, California

Filed February 20, 2009

1937

Before: Alex Kozinski, Chief Judge, Sidney R. Thomas and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

## COUNSEL

Zachery P. Morazzini, Deputy Attorney General for the State of California, on behalf of Defendants-Appellants Arnold Schwarzenegger, in his official capacity as Governor of the State of California, and Edmund G. Brown, in his official capacity as Attorney General of the State of California.

Paul M. Smith, Jenner & Block LLP, on behalf of Plaintiffs-Appellees Video Software Dealers Association and Entertainment Software Association.

## OPINION

CALLAHAN, Circuit Judge:

Defendants-Appellants California Governor Schwarzenegger and California Attorney General Brown (the "State") appeal the district court's grant of summary judgment in favor of Plaintiffs-Appellees Video Software Dealers Association and Entertainment Software Association ("Plaintiffs"), and the denial of the State's cross-motion for summary judgment.[1] Plaintiffs filed suit for declaratory relief seeking to invalidate newly-enacted California Civil Code sections 1746-1746.5 (the "Act"), which impose restrictions and a labeling requirement on the sale or rental of "violent video games" to minors,

---

[1]Plaintiffs are associations of companies that create, publish, distribute, sell and/or rent video games, including games that would be potentially regulated under the California statutory scheme at issue.

on the grounds that the Act violates rights guaranteed by the First and Fourteenth Amendments.[2]

We hold that the Act, as a presumptively invalid content-based restriction on speech, is subject to strict scrutiny and not the "variable obscenity" standard from *Ginsberg v. New York*, 390 U.S. 629 (1968). Applying strict scrutiny, we hold that the Act violates rights protected by the First Amendment because the State has not demonstrated a compelling interest, has not tailored the restriction to its alleged compelling interest, and there exist less-restrictive means that would further the State's expressed interests. Additionally, we hold that the Act's labeling requirement is unconstitutionally compelled speech under the First Amendment because it does not require the disclosure of purely factual information; but compels the carrying of the State's controversial opinion. Accordingly, we affirm the district court's grant of summary judgment to Plaintiffs and its denial of the State's cross-motion. Because we affirm the district court on these grounds, we do not reach two of Plaintiffs' challenges to the Act: first, that the language of the Act is unconstitutionally vague, and, second, that the Act violates Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment.

## I.

### A.

On October 7, 2005, Governor Schwarzenegger signed into law Assembly Bill 1179 ("AB 1179"), codified at Civil Code §§ 1746-1746.5.[3] The Act states that "[a] person may not sell or rent a video game that has been labeled as a violent video

---

[2]All references to "Civil Code" or "section 1746" refer to the California Civil Code unless otherwise indicated.

[3]During the legislative session, A.B. 1179 had been "gutted" and amended; the language in Assembly Bill 450 ("A.B. 450") replaced the original language in A.B. 1179.

game to a minor." Cal. Civ. Code § 1746.1(a).[4] Violators are subject to a civil penalty of up to $1,000. *Id.* at § 1746.3.

Central to this appeal, the Act defines a "violent video game" as follows:

(d)(1) "Violent video game" means a video game in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being, if those acts are depicted in the game in a manner that does either of the following:

(A)  Comes within all of the following descriptions:

(i) A reasonable person, considering the game as a whole, would find appeals to a deviant or morbid interest of minors.

(ii) It is patently offensive to prevailing standards in the community as to what is suitable for minors.

(iii) It causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors.

(B)  Enables the player to virtually inflict serious injury upon images of human beings or characters with substantially human characteristics in a manner which is especially heinous, cruel, or depraved in

---

[4]The parties dispute whether the Act bans purchases or rentals by minors who are accompanied by their parents. The Act does not speak to whether there is an exception for sales to minors accompanied by a parent; it states only that it does not apply "if the violent video game is sold or rented to a minor by the minor's parent, grandparent, aunt, uncle, or legal guardian." Cal. Civ. Code § 1746.1(c).

that it involves torture or serious physical abuse to
the victim.

*Id.* at § 1746(d)(1).[5] Borrowing language from federal death
penalty jury instructions, the Act also defines the terms
"cruel," "depraved," "heinous," and "serious physical abuse,"[6]
and states that "[p]ertinent factors in determining whether a

---

[5]The State concedes on appeal, consistent with the district court's con-
clusion, that the alternate definition of "violent video game" in section
1746(d)(1)(B) is unconstitutional because it "does not provide an excep-
tion for material that might have some redeeming value to minors . . . ."
The State's contention that this section of the Act is severable based on
the severability clause contained in California Civil Code § 1746.5 is sub-
sequently addressed.

[6]Section 1746(d)(2) includes the following definitions:

(A)   "Cruel" means that the player intends to virtually inflict a
high degree of pain by torture or serious physical abuse of the
victim in addition to killing the victim.

(B)   "Depraved" means that the player relishes the virtual killing
or shows indifference to the suffering of the victim, as evidenced
by torture or serious physical abuse of the victim.

(C)   "Heinous" means shockingly atrocious. For the killing
depicted in a video game to be heinous, it must involve additional
acts of torture or serious physical abuse of the victim as set apart
from other killings.

(D)   "Serious physical abuse" means a significant or consider-
able amount of injury or damage to the victim's body which
involves a substantial risk of death, unconsciousness, extreme
physical pain, substantial disfigurement, or substantial impair-
ment of the function of a bodily member, organ, or mental fac-
ulty. Serious physical abuse, unlike torture, does not require that
the victim be conscious of the abuse at the time it is inflicted.
However, the player must specifically intend the abuse apart from
the killing.

(E)   "Torture" includes mental as well as physical abuse of the
victim. In either case, the virtual victim must be conscious of the
abuse at the time it is inflicted; and the player must specifically
intend to virtually inflict severe mental or physical pain or suffer-
ing upon the victim, apart from killing the victim.

killing depicted in a video game is especially heinous, cruel, or depraved include infliction of gratuitous violence upon the victim beyond that necessary to commit the killing, needless mutilation of the victim's body, and helplessness of the victim."[7] *Id.* at § 1746(d)(2)-(3).

The Act also imposes a labeling requirement. It requires that each "violent video game" imported into or distributed in California must "be labeled with a solid white '18' outlined in black," which shall appear on the front face of the game's package and be "no less than 2 inches by 2 inches" in size. *Id.* at § 1746.2.

A.B. 1179 states that the State of California has two compelling interests that support the Act: (1) "preventing violent, aggressive, and antisocial behavior"; and (2) "preventing psychological or neurological harm to minors who play violent video games." A.B. 1179 also "finds and declares" that:

> (a) Exposing minors to depictions of violence in video games, including sexual and heinous violence, makes those minors more likely to experience feelings of aggression, to experience a reduction of activity in the frontal lobes of the brain, and to exhibit violent antisocial or aggressive behavior.

> (b)  Even minors who do not commit acts of violence suffer psychological harm from prolonged exposure to violent video games.

The State included in the excerpts of record several hundred pages of material on which the Legislature purportedly relied in passing the Act. While many of the materials are social science studies on the asserted impact of violent video

---

[7]Legislative materials in the record indicate that the Legislature used these terms in the Act because they survived claims of unconstitutional vagueness in *United States v. Jones*, 132 F.3d 232 (5th Cir. 1998).

games on children, other documents are varied and include legal analyses, general background papers, position papers, etc. Dr. Craig Anderson, whose work is central to the State's arguments in this case, is listed as an author of roughly half of the works included in the bibliography.

## B.

The content of the video games potentially affected by the Act is diverse. Some of the games to which the Act might apply are unquestionably violent by everyday standards, digitally depicting what most people would agree amounts to murder, torture, or mutilation. For example, the State submitted a videotape that contains several vignettes from the games *Grand Theft Auto: Vice City*, *Postal 2*, and *Duke Nukem 3D*, which demonstrate the myriad ways in which characters can kill or injure victims or adversaries.[8] The record also contains descriptions of several games, some of which are based on popular novels or motion pictures, which are potentially covered by the Act. Many of these games have extensive plot lines that involve or parallel historical events, mirror common fictional plots, or place the player in a position to evaluate and make moral choices.

The video game industry has in place a voluntary rating system to provide consumers and retailers information about video game content. The Entertainment Software Rating Board ("ESRB"), an independent, self-regulated body established by the Entertainment Software Association, rates the content of video games that are voluntarily submitted. ESRB assigns each game one of six age-specific ratings, ranging from "Early Childhood" to "Adults Only."[9] It also assigns to

---

[8]We note that the State's videotape contains heavily edited selections of the violence that can be meted out, but does not include any context or possible storyline within which the violence occurs.

[9]The age ratings include "EC" (Early Childhood), "E" (Everyone), "E10+" (Everyone Ten and Older), "T" (Teen [13+]), "M" (Mature [17+]), and "AO" (Adults Only [18+]).

each game one of roughly thirty content descriptors, which include "Animated Blood," "Blood and Gore," "Cartoon Violence," "Crude Humor," "Fantasy Violence," "Intense Violence," "Language," "Suggestive Themes," and "Sexual Violence."

## C.

On October 17, 2005, before the Act took effect, Plaintiffs filed suit against the Governor, the Attorney General, and three city and county defendants, all in their official capacities, for declaratory relief against the Act on the grounds that it violated 42 U.S.C. § 1983 and the First and Fourteenth Amendments. Plaintiffs argued that the Act unconstitutionally restricted freedom of expression on its face based on content regulation and the labeling requirement, was unconstitutionally vague, and violated equal protection.

The district court granted Plaintiffs' motion for a preliminary injunction. *Video Software Dealers Ass'n v. Schwarzenegger*, 401 F. Supp. 2d 1034 (N.D. Cal. 2005). Subsequently, the parties filed cross-motions for summary judgment. The district court granted Plaintiffs' motion and denied the State's cross-motion. *See Video Software Dealers Ass'n v. Schwarzenegger*, No. C-05-04188, slip op. (N.D. Cal. Aug. 6, 2007). The district court's summary judgment order invalidated the Act under strict scrutiny, and did not reach Plaintiffs' claims regarding vagueness, equal protection, or the Act's labeling requirement. The district court permanently enjoined enforcement of the Act. The State timely appealed.

## II.

We review a grant of summary judgment de novo and must "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied substantive law." *Ballen v. City of Redmond*, 466 F.3d

736, 741 (9th Cir. 2006) (citation and internal quotation marks omitted). We draw all reasonable inferences supported by the evidence in the nonmoving party's favor. *Id.* We "may affirm summary judgment on any ground supported by the record." *Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1039 n.3 (9th Cir. 2008).

## III.

**[1]** We first address Plaintiffs' argument that the entire Act should be invalidated based on the State's concession on appeal that the alternate definition of "violent video game" found in section 1746(d)(1)(B) is unconstitutionally broad. The State counters that the Act is saved by the severability clause in Civil Code § 1746.5, which states: "The provisions of this title are severable. If any provision of this title or its application is held to be invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application." We hold that the Act is not wholly invalid as a result of the State's concession.

**[2]** We look to state law to determine the effect of the severability clause. *Qwest Commc'ns Inc. v. City of Berkeley*, 433 F.3d 1253, 1259 (9th Cir. 2006), *overruled on other grounds*, *Sprint Telephony PCS, L.P. v. County of San Diego*, 543 F.3d 571 (9th Cir. 2008) (en banc). Under California law, there is a general presumption in favor a statute's constitutionality. *Ex parte Blaney*, 184 P.2d 892, 900 (Cal. 1947) ("[T]he general presumption of constitutionality, fortified by the express statement of a severability clause, normally calls for sustaining any valid portion of statute unconstitutional in part."). An invalid portion of a statute

> can be severed if, and only if, it is "grammatically, functionally and volitionally separable." It is "grammatically" separable if it is "distinct" and "separate" and, hence, "can be removed as a whole without affecting the wording of any" of the measure's

"other provisions." It is "functionally" separable if it is not necessary to the measure's operation and purpose. And it is "volitionally" separable if it was not of critical importance to the measure's enactment.

*Hotel Employees & Rest. Employees Int'l Union v. Davis*, 981 P.2d 990, 1009 (Cal. 1999) (citations omitted); *see also Jevne v. Superior Court*, 111 P.3d 954, 971 (Cal. 2005).

[3] Section 1746(d)(1)(B) is grammatically and functionally separable because, as an alternate definition of "violent video game," it can be removed from the Act without affecting the wording or function of the Act's other provisions. Plaintiffs contend, however, that such a deletion does not account for the phrase "does either of the following" in section 1746(d)(1), which is the lead-in language to the alternate definitions of "violent video game," and that retaining this phrase results in a "conundrum and grammatical error." Plaintiffs' concerns are accounted for by the simultaneous deletion of the phrase "does either of the following." Although some California cases speak in general terms of separability "as a whole," *see*, *e.g.*, *Jevne*, 111 P.3d at 972, the California Supreme Court has also evaluated grammatical and functional separability with respect to whether the valid and invalid portions of a statute or initiative can be "separated by paragraph, sentence, clause, phrase, or even single words." *Santa Barbara Sch. Dist. v. Superior Court of Santa Barbara County*, 530 P.2d 605, 617 (Cal. 1975); *see also Ex parte Blaney*, 184 P.2d at 900; *accord Schweitzer v. Westminster Invs.*, 69 Cal. Rptr. 3d 472, 485 (Ct. App. 2007). Here, the phrase "does either of the following" can be cleanly stricken without doing violence to the rest of the Act or impermissibly reading into the statute any exceptions or qualifications. *See Fort v. Civ. Serv. Comm'n of Alameda County*, 392 P.2d 385, 390 (Cal. 1964).[10]

---

[10]Although not argued by the parties, we note that deleting Civil Code § 1746(d)(1)(B) also appears to require the deletion of sections 1746(d)(2) and (d)(3)—which define when a violent act is "cruel," "depraved," or "heinous," or involves "serious physical abuse" or "torture"—because these sections only relate to or explain section 1746(d)(1)(B).

**[4]** Sections 1746(d)(1)(B), (d)(2), and (d)(3) are also volitionally separable. We must ask whether the inclusion of these sections was of critical importance to passage of the Act and whether the Act "would have been adopted by the legislative body had [it] foreseen the partial invalidation of the statute." *Sonoma County Org. of Pub. Employees v. County of Sonoma*, 591 P.2d 1, 14 (Cal. 1979) (citation and internal quotation marks omitted). Evidence in the record indicates that the Legislature included sections 1746(d)(1)(B), (d)(2) and (d)(3) in the Act with the express goal of avoiding the constitutional pitfalls identified in *Video Software Dealers Association v. Maleng*, 325 F. Supp. 2d 1180 (W.D. Wash. 2004). An Assembly Judiciary Committee Mandatory Information Worksheet to A.B. 450 and a Research Summary to A.B. 450 both indicate that these detailed definition sections were included in the Act for the purpose of avoiding the result in *Maleng,* where a Washington district court struck down a 2003 state statute, in part, because it was not narrowly tailored. Further, the Assembly Third Reading to A.B. 450 also discusses the tailoring issues in *Maleng*, and notes that the Act "regulates the sale of only those games that contain the most heinous, cruel or depraved acts of violence." Nonetheless, the record does not persuade us that sections 1746(d)(1)(B), (d)(2) and (d)(3) were "critical" to the passage of the Act. The fact that the Legislature included an alternate definition for "violent video game" designed to help the Act withstand a constitutional challenge does not necessarily indicate that it would not have passed the Act but for the inclusion of these sections. Accordingly, in light of California's presumption in favor of retaining constitutional parts of statutes, we conclude that the Act is not wholly invalid as a result of the State's concession.

## IV.

**[5]** Our next task is to determine what level of scrutiny to apply in reviewing the Act's prohibitions. Existing case law indicates that minors are entitled to a significant measure of

First Amendment protections, that content-based regulations are presumptively invalid and subject to strict scrutiny, and that if less restrictive means for achieving a state's compelling interest are available, they must be used. The State's argument on appeal, that we should not apply strict scrutiny and instead should apply a "variable obscenity" standard from *Ginsberg v. New York*, 390 U.S. 629 (1968), raises a question of first impression in this circuit.

[6] The Supreme Court has stated that "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975) (citations omitted). The State does not contest that video games are a form of expression protected by the First Amendment.[11] *See Interactive Digital Software Ass'n v. St. Louis*, 329 F.3d 954, 956-58 (8th Cir. 2003) (holding that "violent" video games are a protected form of speech); *Maleng*, 325 F. Supp. 2d at 1184-85 (same). It is also undisputed that the Act seeks to restrict expression in video games based on its content. *See Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles County Sheriff Dep't*, 533 F.3d 780, 787 (9th Cir. 2008) ("[A] law is content-based if either the main purpose in enacting it was to suppress or exalt speech of a certain content, or it differentiates based on the content of speech on its face." (citation and internal quotation marks omitted)); *Interactive Digital Software Ass'n*, 329 F.3d at 958 (holding that an ordinance that applied to graphically violent video games was a content-based restriction).

---

[11]The Supreme Court has not specifically commented on whether video games contain expressive content protected under the First Amendment; however, story-laden video games of the type potentially covered under the Act are similar to movies, which the Court has long held are protected expression notwithstanding their ability to entertain as well as inform. *See, e.g., Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952).

"Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). We ordinarily review content-based restrictions on protected expression under strict scrutiny, and thus, to survive, the Act "must be narrowly tailored to promote a compelling Government interest." *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). "If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Id.*; *see also Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("The Government may . . . regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest."); *Reno v. ACLU*, 521 U.S. 844, 876-77 (1997) (finding relevant the fact that a reasonably effective method by which parents could prevent children from accessing internet material which parents believed to be inappropriate "will soon be widely available").

The State, however, urges us to depart from this framework because the Act concerns minors. It argues that we should analyze the Act's restrictions under what has been called the "variable obscenity" or "obscenity as to minors" standard first mentioned in *Ginsberg*, 390 U.S. 629. In essence, the State argues that the Court's reasoning in *Ginsberg* that a state could prohibit the sale of sexually-explicit material to minors that it could not ban from distribution to adults should be extended to materials containing violence. This presents an invitation to re-consider the boundaries of the legal concept of "obscenity" under the First Amendment.

**[7]** In *Ginsberg*, the Court held that New York State could prohibit the sale of sexually-explicit material to minors that was defined by statute as obscene because of its appeal to minors. *Id.* at 643, 646. Therefore, the state could prohibit the sale of "girlie magazines" to minors regardless of the fact that the material was not considered obscene for adults. *Id.* at 643. The Court stated that "[t]o sustain the power to exclude mate-

rial defined as obscenity by [the statute] requires only that we be able to say that it was not irrational for the legislature to find that exposure to material condemned by the statute is harmful to minors."[12] *Id.* at 641. The Court offered two justifications for applying this rational basis standard: (1) that "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society"; and (2) the state's "independent interest in the well-being of its youth." *Id.* at 639-40.

The State suggests that the justifications underlying *Ginsberg* should apply to the regulation of violent content as well as sexually explicit material. The assertion, however, fails when we consider the category of material to which the *Ginsberg* decision applies and the First Amendment principles in which that decision was rooted.

**[8]** *Ginsberg* is specifically rooted in the Court's First Amendment obscenity jurisprudence, which relates to non-protected sex-based expression—not violent content, which is presumably protected by the First Amendment. *See* 390 U.S. at 640. *Ginsberg* explicitly states that the New York statute under review "simply adjusts the definition of obscenity to social realities by permitting the appeal of this type of material to be assessed in term of the sexual interests of such minors." *Id.* at 638 (citation, internal quotation marks, and alterations omitted). The definition of obscenity that *Ginsberg* adjusted was the Court's obscenity test announced in *Roth v. United States*, which dealt with obscene materials defined with reference to sex. 354 U.S. 476, 485-87 (1957) (discuss-

---

[12]The statute in *Ginsberg* used the defined term "harmful to minors," which prohibited access by minors when it: "(i) predominantly appeals to the prurient, shameful or morbid interest of minors, and [¶] (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and [¶] (iii) is utterly without redeeming social importance for minors." *Id.* at 646.

ing the nature of obscenity at length and stating, among other things, that "[o]bscene material is material which deals with sex in a manner appealing to prurient interest."). The *Ginsberg* Court applied a rational basis test to the statute at issue because it placed the magazines at issue within a sub-category of obscenity—obscenity as to minors—that had been determined to be not protected by the First Amendment, and it did not create an entirely new category of expression excepted from First Amendment protection. The State, in essence, asks us to create a new category of non-protected material based on its depiction of violence.

The Supreme Court has carefully limited obscenity to sexual content. Although the Court has wrestled with the precise formulation of the legal test by which it classifies obscene material, it has consistently addressed obscenity with reference to sex-based material. Such was the case in *Roth* and *Memoirs v. Massachusetts*, 383 U.S. 413 (1966), which modified *Roth*. And though it post-dates *Ginsberg*, the Court in *Miller v. California* expressly cabined the First Amendment concept of obscenity in terms of sexual material. 413 U.S. 15, 24 (1973) ("[W]e now confine the permissible scope of such regulation to works which depict or describe sexual conduct.")

Circuit courts have resisted attempts to broaden obscenity to cover violent material as well as sexually-explicit material. In *American Amusement Machine Association v. Kendrick*, which involved a video game restriction that mixed the regulation of sexual and violent material, the Seventh Circuit discussed why "[v]iolence and obscenity are distinct categories of objectionable depiction," explaining that obscenity is concerned with "offensiveness," whereas ordinances like the one at issue in *Kendrick* (and here) are concerned with conduct or harm. 244 F.3d 572, 574-75 (7th Cir. 2001), *cert. denied*, 534 U.S. 994 (2001).[13] In *Video Software Dealers Association v.*

---

[13]Citing one law review article, the State also urges us to redefine the First Amendment meaning of "obscenity"—which involves material

*Webster*, the Eighth Circuit held that videos "that contain[ ] violence but not depictions or descriptions of sexual conduct cannot be obscene." 968 F.2d 684, 688 (8th Cir. 1992) ("Obscenity . . . encompasses only expression that 'depict[s] or describe[s] sexual conduct' " (citing *Miller*, 413 U.S. at 24)). Likewise, in *Eclipse Enterprises, Inc. v. Gullota*, the Second Circuit declined to place trading cards which depicted heinous crime that was allegedly harmful to minors in the category of unprotected obscenity. 134 F.3d 63, 66-68 (2d Cir. 1997). Further, in *James v. Meow Media, Inc.*, the Sixth Circuit, in discussing excessively violent movies and video game material, "decline[d] to extend [its] obscenity jurisprudence to violent, instead of sexually explicit, material." 300 F.3d 683, 698 (6th Cir. 2002).

Finally, we note that the *Ginsberg* Court suggested its intent to place a substantive limit on its holding. It stated:

> We have no occasion in this case to consider the impact of the guarantees of freedom of expression upon the totality of the relationship of the minor and the State. It is enough for the purposes of this case that we inquire whether it was constitutionally impermissible for New York . . . to accord minors under 17 a more restricted right than that assured to adults to judge and determine for themselves what sex material they may read or see.

related to sex—by substituting an ordinary definition of obscenity based on its Latin root. In *Maleng*, Judge Lasnik rejected the same argument. 325 F. Supp. 2d at 1185. He explained that the phrase "obscene material" was not inherently limited to sexually explicit material in the ordinary sense, and that the Latin root "obscaenus" literally means "filth." *Id.* Nonetheless, he held, relying on *Miller*, 413 U.S. 15, that "when used in the context of the First Amendment, the word 'obscenity' means material that deals with sex." *Id.* This reasoning, dismissing the linguistic argument, applies equally to the State's argument here.

*Ginsberg*, 390 U.S. at 636-37 (citation omitted). Though not the clearest of disclaimers, this language telegraphs that the Court's concern in *Ginsberg* was with the relationship between the state and minors with respect to a certain subject matter—"sex material" as it relates to the interests of minors.

**[9]** In light of our reading of *Ginsberg* and the cases from our sister circuits, we decline the State's invitation to apply the *Ginsberg* rationale to materials depicting violence, and hold that strict scrutiny remains the applicable review standard.[14] Our decision is consistent with the decisions of several other courts that have addressed and rejected the argument that the *Ginsberg* standard be extended from the field of sex-based content to violence in video games. *See Interactive Digital Software Ass'n*, 329 F.3d at 959; *Kendrick*, 244 F.3d at 576-78; *Entm't Software Ass'n v. Granholm*, 426 F. Supp. 2d 646, 652 (E.D. Mich. 2006); *Maleng*, 325 F. Supp. 2d at 1185-86. At oral argument, the State confirmed that it is asking us to boldly go where no court has gone before. We decline the State's entreaty to extend the reach of *Ginsberg* and thereby redefine the concept of obscenity under the First Amendment.

## V.

**[10]** Accordingly, we review the Act's content-based prohibitions under strict scrutiny. As noted above, "[c]ontent-based regulations are presumptively invalid," *R.A.V.*, 505 U.S. at 382, and to survive the Act "must be narrowly tailored to promote a compelling Government interest." *Playboy Entm't Group, Inc.*, 529 U.S. at 813. Further, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Id.*

---

[14]We also reject the State's more general request that we equate violent content with unprotected "obscenity." As the discussion above indicates, the Court's obscenity jurisprudence limits obscene materials to sex-based materials.

**A.**

The Legislature stated that it had two compelling interests in passing the Act: (1) "preventing violent, aggressive, and antisocial behavior"; and (2) "preventing psychological or neurological harm to minors who play violent video games." Although there was some early confusion over whether the State was relying on both of these interests, the State subsequently clarified that "[t]he physical and psychological well-being of children is the concern of the Act," as distinguished from the interest of protecting third parties from violent behavior. The State's focus is on the actual harm to the brain of the child playing the video game. Therefore, we will not assess the Legislature's purported interest in the prevention of "violent, aggressive, and antisocial behavior."[15]

**[11]** The Supreme Court has recognized that "there is a compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns of Cal., Inc.*, 492 U.S. at 126; *see also Entm't Software Ass'n v. Swanson*, 519

---

[15]Throughout this litigation, the parties have disagreed as to what extent *Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam), applies to this case. The dispute stems from the fact that one of the compelling interests advanced by the Legislature is the prevention of "violent, aggressive, and antisocial behavior." One of the Legislature's findings was that "[e]xposing minors to depictions of violence in video games . . . makes those minors more likely . . . to exhibit violent antisocial or aggressive behavior." However, "[t]he government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.' " *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) (citation omitted). It "may suppress speech for advocating the use of force or a violation of law only if 'such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.' " *Id.* (citing *Brandenburg*, 395 U.S. at 447). District courts analyzing the violence prevention rationale have rejected it. *See Entertainment Software Association v. Blagojevich*, 404 F. Supp. 2d 1051, 1073 (N.D. Ill. 2005); *Granholm*, 426 F. Supp. 2d at 652; *Entm't Software Ass'n v. Foti*, 451 F. Supp. 2d 823, 831 (M.D. La. 2006); *Maleng*, 325 F. Supp. 2d at 1187 n.3.

F.3d 768, 771 (8th Cir. 2008); *Interactive Digital Software Ass'n*, 329 F.3d at 958; *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997); *Maleng*, 325 F. Supp. 2d at 1186-87. Notwithstanding this abstract compelling interest, when the government seeks to restrict speech "[i]t must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (plurality op.); *Swanson*, 519 F.3d at 771; *Interactive Digital Software Ass'n*, 329 F.3d at 958-59. Although we must accord deference to the predictive judgments of the legislature, our "obligation is to assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (citations and quotation marks omitted); *see also Playboy Entm't Group, Inc.*, 529 U.S. at 822 ("This is not to suggest that a 10,000-page record must be compiled in every case or that the Government must delay in acting to address a real problem; but the Government must present more than anecdote and supposition. The question is whether an actual problem has been proved . . . ." ).

In evaluating the State's asserted interests, we must distinguish the State's interest in protecting minors from actual psychological or neurological harm from the State's interest in controlling minors' thoughts. The latter is not legitimate. The Supreme Court has warned that the

> government cannot constitutionally premise legislation on the desirability of controlling a person's private thoughts. First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end. The right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought.

*Ashcroft*, 535 U.S. at 253 (citation and internal quotation marks omitted.) In *Kendrick*, the Seventh Circuit commented on a psychological harm rationale in the violent video game context:

> Violence has always been and remains a central interest of humankind and a recurrent, even obsessive theme of culture both high and low. It engages the interest of children from an early age, as anyone familiar with the classic fairy tales collected by Grimm, Andersen, and Perrault is aware. To shield children right up to the age of 18 from exposure to violent descriptions and images would not only be quixotic, but deforming; it would leave them unequipped to cope with the world as we know it.

244 F.3d at 579; *see also Interactive Digital Software Ass'n*, 329 F.3d at 960 ("Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.") (citation and quotation marks omitted). Because the government may not restrict speech in order to control a minor's thoughts, we focus on the State's psychological harm rationale in terms of some actual effect on minors' psychological health.

[12] Whether the State's interest in preventing psychological or neurological harm to minors is legally compelling depends on the evidence the State proffers of the effect of video games on minors. Although the Legislature is entitled to some deference, the courts are required to review whether the Legislature has drawn reasonable inferences from the evidence presented. *See Turner Broad. Sys., Inc.*, 520 U.S. at 195. Here, the State relies on a number of studies in support of its argument that there is substantial evidence of a causal effect between minors playing violent video games and actual psychological harm.

The State relies heavily on the work of Dr. Craig Anderson, pointing to Dr. Anderson's 2004 updated meta-analysis called *An update on the effects of playing violent video games*.[16] Craig A. Anderson, *An update on the effects of playing violent video games*, 27 J. ADOLESCENCE 113 (2004). This article states that it "reveals that exposure to violent video games is significantly linked to increases in aggressive behaviour, aggressive cognition, aggressive affect, and cardiovascular arousal, and to decreases in helping behaviour." Even upon lay review, however, the disclaimers in this article, alone, significantly undermine the inferences drawn by the State in support of its psychological harm rationale.[17] First, Dr. Anderson remarks on the relative paucity of the video game literature and concedes that the violent video game literature is not sufficiently large to conduct a detailed meta-analysis of the specific methodological features of other studies, many of which were themselves flawed. Second, he further states that "[t]here is not a large enough body of samples . . . for truly sensitive tests of potential age difference in susceptibility to violent video game effects," and jettisons mid-article his exploration of the effect of age differences (i.e., over-eighteen versus under-eighteen). It appears that he abandoned the age aspect of the study, in part, because "there was a hint that the aggressive behaviour results might be slightly larger for the 18 and over group." He concludes the meta-analysis with the admission that there is a "glaring empirical gap" in video game violence research due to "the lack of longitudinal studies."

---

[16]Meta-analysis is "a quantitative method for integrating existing studies" where "statistical procedures are used to assess the magnitude of a phenomenon across different studies, independent of the studies' sample sizes." David L. Faigman et al., 2 MOD. SCI. EVIDENCE § 18:13 (2005-06 Ed.).

[17]Dr. Anderson's hearing testimony in the *Blagojevich* case, which is in the record, contains his assent to the statements that there is probably an "infinite" number of stimuli that could cause aggression or aggressive thoughts in a person (e.g., a picture of a gun), and that his selection of violent video games was "largely a matter of [his] choice."

Thus, Dr. Anderson's research has readily admitted flaws that undermine its support of the State's interest in regulating video games sales and rentals to minors, perhaps most importantly its retreat from the study of the psychological effects of video games as related to the age of the person studied.[18] Although not dispositive of this case, we note that other courts have either rejected Dr. Anderson's research or found it insufficient to establish a causal link between violence in video games and psychological harm. *See Kendrick*, 244 F.3d at 578; *Granholm*, 426 F. Supp. 2d at 653; *Entm't Software Ass'n v. Hatch*, 443 F. Supp. 2d 1065, 1069 & n.1 (D. Minn. 2006); *Blagojevich*, 404 F. Supp. 2d at 1063.

The State also relies on a study of the effects of video game violence on adolescents, conducted by Dr. Douglas Gentile, which studied eighth and ninth graders and concluded that "[a]dolescents who expose themselves to greater amounts of video game violence were more hostile" and reported getting into more arguments and fights and performing poorly in school. Douglas A. Gentile et al., *The effects of violent video game habits on adolescent hostility, aggressive behaviors, and school performance*, 27 J. ADOLESCENCE 5 (2004). The extent to which this study supports the State's position is suspect for similar reasons as Dr. Anderson's work. First, this study states that due to its "correlational nature" it could not directly answer the following question: "Are young adolescents more hostile and aggressive because they expose themselves to media violence, or do previously hostile adolescents prefer violent media?" Second, this study largely relates to the player's violent or aggressive behavior toward others—which,

---

[18]The State also relies on a 2003 study on general media violence by Dr. Anderson, which contains a three-page section on violent video games and reflects the conclusions and shortfalls of the 2004 meta-analysis. Craig A. Anderson et al., *The Influence of Media Violence on Youth*, 4 PSYCHOLOGICAL SCIENCE IN THE PUBLIC INTEREST 81, 90-93 (2003). For example, the study states that "[t]here are no published longitudinal surveys specifically focusing on effects of violent video games on aggression."

as noted above, is not the interest relied on by the State here —rather than the psychological or neurological harm to the player. Moreover, the study glaringly states that "[i]t is important to note . . . that this study is limited by its correlational nature. *Inferences about causal direction should be viewed with caution*" (emphasis added). Finally, Dr. Gentile's study suggests that "[a]dditional experimental and longitudinal research is needed."

Additionally, the State relies on a study by Dr. Jeanne Funk for the proposition that video games can lead to desensitization to violence in minors. Jeanne B. Funk et al., *Violence exposure in real-life, video games, television, movies, and the internet: is there desensitization?*, 27 J. ADOLESCENCE 23 (2004). Like the others, this study presents only an attenuated path between video game violence and desensitization. It specifically disclaims that it is based on correlation principles and that "causality was not studied."

Finally, the State relies on a two-page press release from Indiana University regarding the purported connection between violent video games and altered brain activity in the frontal lobe. Press Release, Indiana University School of Medicine, Aggressive Youths, Violent Video Games Trigger Unusual Brain Activity (Dec. 2, 2002). The research described, conducted in part by Dr. Kronenberger, has been criticized by courts that have reviewed it in depth. *See Blagojevich*, 404 F. Supp. 2d at 1063-65 ("Dr. Kronenberger conceded that his studies only demonstrate a correlative, not a causal, relationship between high media violence exposure and children who experience behavioral disorders [or] decreased brain activity . . . ."); *Granholm*, 426 F. Supp. 2d at 653 ("Dr. Kronenberger's research not only fails to provide concrete evidence that there is a connection between violent media and aggressive behavior, it also fails to distinguish between video games and other forms of media.").

**[13]** In sum, the evidence presented by the State does not support the Legislature's purported interest in preventing psy-

chological or neurological harm. Nearly all of the research is based on correlation, not evidence of causation, and most of the studies suffer from significant, admitted flaws in methodology as they relate to the State's claimed interest. None of the research establishes or suggests a causal link between minors playing violent video games and actual psychological or neurological harm, and inferences to that effect would not be reasonable. In fact, some of the studies caution against inferring causation. Although we do not require the State to demonstrate a "scientific certainty," the State must come forward with more than it has. As a result, the State has not met its burden to demonstrate a compelling interest.

**B.**

Even if we assume that the State demonstrated a compelling interest in preventing psychological or neurological harm, the State still has the burden of demonstrating that the Act is narrowly tailored to further that interest, and that there are no less restrictive alternatives that would further the Act. *Playboy Entm't Group, Inc.*, 529 U.S. at 813. We hold that the State has not demonstrated that less restrictive alternative means are not available.

Instead of focusing its argument on the possibility of less restrictive means, the State obscures the analysis by focusing on the "most effective" means, which it asserts is the one thousand dollar penalty imposed for each violation. Specifically, the State argues that the ESRB rating system, a voluntary system without the force of law or civil penalty, is not a less-restrictive alternative means of furthering the Legislature's purported compelling interest. Acknowledging that the industry has implemented new enforcement mechanisms, the State nevertheless argues that the ESRB does not adequately prevent minors from purchasing M-rated games. The State also dismisses the notion that parental controls on modern gaming systems could serve the government's purposes, arguing that there is no evidence that this technology existed at the

time the Act was passed. *But see Foti*, 451 F. Supp. 2d at 833 (suggesting that such controls could be a less-restrictive measure); *cf. Reno*, 521 U.S. at 876-77 (finding relevant the fact that a reasonably effective method by which parents could prevent children from accessing internet material which parents believed to be inappropriate "will soon be widely available").

Further, the State does not acknowledge the possibility that an enhanced education campaign about the ESRB rating system directed at retailers and parents would help achieve government interests. *See also Playboy*, 529 U.S. at 816 ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507-08 (1996) (plurality op.) (striking down ban on advertising alcohol prices because of less restrictive alternatives, such as an educational campaign or counter-speech). The State appears to be singularly focused on the "most effective" way to further its goal, instead of the "least restrictive means," and has not shown why the less-restrictive means would be ineffective.

**[14]** Even assuming that the State's interests in enacting the Act are sufficient, the State has not demonstrated why less restrictive means would not forward its interests. The Act, therefore, is not narrowly tailored. Based on the foregoing, and in light of the presumptive invalidity of content-based restrictions, we conclude that the Act fails under strict scrutiny review.

## VI.

Finally, we evaluate the constitutionality of the Act's labeling provision, which requires that the front side of the package of a "violent video game" be labeled with a four square-inch label that reads "18." Cal. Civ. Code § 1746.2. Plaintiffs

argue that section 1746.2 unconstitutionally forces video game retailers to carry the State of California's subjective opinion, a message with which it disagrees. The State counters that the "labeling provision impacts the purely commercial aspect regarding retail sales of the covered video games" and, under the resulting rational basis analysis, the labeling requirement is rationally related to the State's "self-evident purpose of communicating to consumers and store clerks that the video game cannot be legally purchased by anyone under 18 years of age."

**[15]** Generally, "freedom of speech prohibits the government from telling people what they must say." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006); *see also United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001); *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 795 (1988). Commercial speech, however, is generally accorded less protection than other expression. *See United Foods, Inc.*, 533 U.S. at 409. The Court has upheld compelled commercial speech where the state required inclusion of "purely factual and uncontroversial information" in advertising. *See Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985) (upholding state's requirement that attorney include in his advertisements a disclosure that clients may be responsible for litigation costs); *see also United States v. Schiff*, 379 F.3d 621, 630-31 (9th Cir. 2004) (holding that the government could compel website operator to post factual information about potential criminal liability if patrons used website to evade taxes); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113-15 (2d Cir. 2001) (upholding state labeling law that required manufacturers of mercury-containing products to disclose on packaging factual and uncontroversial information about the disposal of mercury-containing products). Compelled disclosures, justified by the need to "dissipate the possibility of consumer confusion or deception," are permissible if the "disclosure requirements are reasonably related to the

State's interest in preventing deception of customers." *Zauderer*, 471 U.S. at 651.[19]

[16] Ordinarily, we would initially decide whether video game packaging constitutes separable commercial speech or commercial speech that is "inextricably intertwined" with otherwise fully-protected speech. *See Riley*, 487 U.S. at 795-96 (stating that "[i]t is not clear that . . . speech is necessarily commercial whenever it relates to [a] person's financial motivation for speaking"). That analysis would direct what level of scrutiny to apply to the labeling requirement. However, we need not decide that question because the labeling requirement fails even under the factual information and deception prevention standards set forth in *Zauderer*.[20] Our holding above, that the Act's sale and rental prohibition is unconstitutional, negates the State's argument that the labeling provision only requires that video game retailers carry "purely factual and uncontroversial information" in advertising. *Zauderer*, 471 U.S. at 651. Unless the Act can clearly and legally characterize a video game as "violent" and not subject to First Amendment protections, the "18" sticker does not convey factual information.

---

[19]Heightened scrutiny may apply, however, if the commercial speech is "inextricably intertwined" with otherwise fully-protected speech, e.g., political speech, charitable solicitations. *Riley*, 487 U.S. at 796; *Cal-Almond, Inc. v. U.S. Dep't of Agric.*, 14 F.3d 429, 436 (9th Cir. 1993).

[20]We note that on similar facts, the Seventh Circuit, in *Entertainment Software Association v. Blagojevich*, struck down a statute's requirement that video game retailers affix a four square-inch sticker reading "18" on any video game the state defined as "sexually explicit." 469 F.3d 641, 651-52 (7th Cir. 2006). The court applied strict scrutiny because, in its view, the label did not concern the disclosure of "purely factual" information—the label reflected the state's opinion that the product contained material that the state deemed "sexually explicit" and communicated a "subjective and highly controversial message." *Id.* at 652. We do not adopt the *Blagojevich* court's approach here because it is not clear what authority supported its application of strict scrutiny, and we conclude that the labeling requirement here is invalid under a less-strict review standard.

Moreover, the labeling requirement fails *Zauderer's* rational relationship test, which asks if the "disclosure requirements are reasonably related to the State's interest in preventing deception of customers." *Id.* at 651. Our determination that the Act is unconstitutional eliminates the alleged deception that the State's labeling requirement would purportedly prevent: the misleading of consumers and retailers by the ESRB age ratings that already appear on the video games' packaging. Since the Act is invalid and, as a result, there is no state-mandated age threshold for the purchase or rental of video games, there is no chance for deception based on the possibly conflicting ESRB rating labels. In fact, the State's mandated label would arguably now convey a false statement that certain conduct is illegal when it is not, and the State has no legitimate reason to force retailers to affix false information on their products. *See Hatch*, 443 F. Supp. 2d at 1072, *aff'd on other grounds*, *Swanson*, 519 F.3d 768.

## VII.

We decline the State's invitation to apply the variable obscenity standard from *Ginsberg* to the Act because we do not read *Ginsberg* as reaching beyond the context of restrictions on sexually-explicit materials or as creating an entirely new category of expression—speech as to minors—excepted from First Amendment protections. As the Act is a content based regulation, it is subject to strict scrutiny and is presumptively invalid. Under strict scrutiny, the State has not produced substantial evidence that supports the Legislature's conclusion that violent video games cause psychological or neurological harm to minors. Even if it did, the Act is not narrowly tailored to prevent that harm and there remain less-restrictive means of forwarding the State's purported interests, such as the improved ESRB rating system, enhanced educational campaigns, and parental controls. Finally, even if the Act's labeling requirement affects only commercial speech in the form of video game packaging, that provision constitutes impermissibly compelled speech because the compelled label

would not convey purely factual information. Accordingly, the district court's grant of summary judgment to Plaintiffs and denial of the State's cross-motion for summary judgment is **AFFIRMED**.